951 P.2d 934

STATE of Hawai'i, Plaintiff–Appellant,

v.

Dayton B. KANE, Defendant–Appellee,

and

Wendell K. Apao, Sr., Defendant.

No. 20692.

Supreme Court of Hawai'i.

Jan. 7, 1998.

Alexa D.M. Fujise, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff-appellant State of Hawai'i.

Richard L. Hoke, Honolulu, for defendant-appellee Dayton B. Kane.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The plaintiff-appellant State of Hawai'i (the prosecution) appeals from the circuit court's "Findings of Fact, Conclusions of Law, and Order Denying Motion to Suppress Items and Granting Motions to Suppress Statements and to Dismiss Count II as Based on an Unconstitutionally Vague and Overbroad Statute." On appeal, the prosecution argues: (1) that Hawai'i Revised Statutes (HRS) § 134–8 (1993) [1] is not unconstitutionally vague or overbroad, either on its face or as applied; and (2) statements made by the defendant-appellee Dayton B. Kane to a police officer following his arrest, but before he was afforded the procedural safeguards required by the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), either (a) were not in answer to questions designed to elicit an incriminating response or (b) fall within the "public safety" exception to *Miranda*, and, therefore, need not be suppressed.

The prosecution's second argument fails. The record establishes that the questions posed to Kane were designed to elicit an incriminating response. Therefore, Kane's statements may not be admitted absent a showing that the procedural safeguards required by *Miranda* were satisfied. This court has not recognized a "public safety" exception to the requirement that a criminal suspect must be given *Miranda* warnings prior to any custodial interrogation in order to protect the rights afforded by article I, section 10 of the Hawai'i Constitution. Furthermore, under *federal* constitutional analysis, the "public safety" exception to *Miranda*, as set forth by the United States Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), is not available upon the facts of this case. We therefore affirm that portion of the circuit

1. HRS § 134–8 provides in relevant part:

    **§ 134–8 Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties.** (a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134–4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

    . . . .

    (d) Any person violating subsection (a) . . . shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. . . .

court's order granting Kane's motion to suppress statements. However, inasmuch as we hold that HRS § 134–8 is not unconstitutionally vague or overbroad, we (1) reverse that portion of the circuit court's order granting the motion to dismiss count II of the indictment and (2) remand this case for further proceedings.

## I. BACKGROUND

On the afternoon of October 20, 1996, a pickup truck carrying Kane and three companions was stopped by police near Makai Pier, on Kalaniana'ole Highway, in connection with a robbery attempt that had occurred a few minutes earlier.[2] Kane was arrested after he was identified as the perpetrator by the robbery victim. After Kane's arrest, Officer John Veneri of the Honolulu Police Department (HPD) was assigned to "stand by" the pickup truck, which was registered to Kane, until a tow truck arrived to remove it from the scene. While waiting, Officer Veneri looked through the truck's passenger window and observed what appeared to be flare guns protruding from a fanny pack located in the truck's middle console area. After consultation with his supervisor about the sighting, Officer Veneri obtained a "consent to search" form and read and explained it to Kane, who was seated, handcuffed, in a nearby patrol car; Kane signed the consent to search form.

After receiving Kane's consent to search the truck, Officer Veneri retrieved the fanny pack with the flare guns. While searching the fanny pack, Officer Veneri discovered "a shot gun shell taped to the rear of [a] cigar tube [with] a fuse on the end of it." Suspecting that the object was an explosive device and being concerned for the safety of the police officers at the scene and beachgoers in the area, Officer Veneri put the object down, approached Kane, and, without first giving *Miranda* warnings, asked what the object was and what Kane was doing with it. Kane told Veneri that the object contained "bagged gunpowder and beebees and at the end was a

shotgun shell" and that "he had it in case he got mobbed." Based upon Kane's response, Officer Veneri called "the bomb people at HPD" and requested that they come to the scene and dismantle the bomb.

Eventually, Kane was charged with robbery in the second degree in violation of HRS § 708–841(1)(a) (1993) (Count I), possession of bomb prohibited in violation of HRS § 134–8 (Count II), and three counts of possession of ammunition by a person convicted of certain crimes in violation of HRS §§ 134–7(b) and (h) (1993) (Counts III, IV, and V).

Kane filed three pretrial motions. In support of the first, which sought to suppress the statements made to Officer Veneri, Kane argued that the custodial interrogation by Officer Veneri did not afford him the procedural safeguards required by the United States Supreme Court's holding in *Miranda* and, therefore, that his statements to Officer Veneri must be suppressed. In his second motion, Kane sought dismissal of count II, contending that HRS § 134–8 was unconstitutionally vague and overbroad inasmuch as "it does not define 'bomb' nor does it set forth any standard to adjudge a person guilty for possessing a 'bomb.'" Kane's third motion sought to suppress admission of the items seized from the fanny pack into evidence and was grounded upon his claim that, inasmuch as he had been drinking and using drugs prior to the incident, he had not understood the consent form that he had signed permitting the search of his truck and, therefore, that Officer Veneri's search of the pack was "without a warrant, exigent circumstances[,] or [Kane's valid] consent."

After a hearing, the circuit court granted Kane's first two motions and denied the third in a single written order, filed on April 30, 1997. The prosecution filed a timely notice of appeal from the parts of the order granting Kane's motions to suppress statements and to dismiss count II of the indictment. Kane did not cross-appeal from the portion

---

**2.** Kane's codefendant, Wendell Apao, Sr., was one of his companions in the truck and was charged in Count VI of the indictment with Accomplice to Robbery in violation of HRS §§ 702– 221(2)(c) (1993), 702–222(1)(b) (1993), and 708– 841(1)(a) (1993). Apao is not a party to this appeal.

of the order denying his motion to suppress items.

## II. STANDARDS OF REVIEW

### A. The Constitutionality Of A Statute

When confronted with a constitutional challenge of a penal statute on the grounds of vagueness or overbreadth, we apply a number of principles on appeal.

First,

[t]he constitutionality of a statute is a question of law which is reviewable under the right/wrong standard. Additionally, where it is alleged that the legislature has acted unconstitutionally, this court has consistently held that every enactment of the legislature is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest and unmistakable.

. . . .

Second, we construe penal statutes narrowly, considering them in light of precedent, legislative history, and common sense. . . .

Third, where possible, we will read a penal statute in such a manner as to preserve its constitutionality.

To accord a constitutional interpretation of a provision of broad or apparent unrestricted scope, courts will strive to focus the scope of the provision to a narrow and more restricted construction.

Provisions of a penal statute will be accorded a limited and reasonable interpretation under this doctrine in order to preserve its overall purpose and to avoid absurd results.

Put differently, a statute will not be held unconstitutional by reason of uncertainty if any sensible construction embracing the legislative purpose may be given it. Mere difficulty in ascertaining its meaning, or the fact that it is susceptible to interpretation will not render it nugatory. . . .

. . .

*State v. Gaylord,* 78 Hawai'i 127, 137–38, 890 P.2d 1167, 1177–78 (1995) (quoting *State v. Lee,* 75 Haw. 80, 90–91, 856 P.2d 1246, 1253 (1993) and *State v. Taylor,* 49 Haw. 624, 634–35, 425 P.2d 1014, 1021 (1967)) (other citations, internal quotation marks, ellipsis points and brackets omitted).

*State v. Bates,* 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997).

### B. Findings of Fact and Conclusions of Law

[Findings of fact] are reviewed under the clearly erroneous standard. *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Id.*

We review the trial court's [conclusions of law] *de novo* under the "right/wrong" standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this . . . standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*Aickin v. Ocean View Investments Co.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997).

## III. DISCUSSION

### A. HRS § 134–8 Is Not Unconstitutionally Vague Or Overbroad On Its Face Or As Applied.

#### 1. Vagueness

■ In order to determine the constitutionality of HRS § 134–8, we must first define its elements. A person commits the offense of "possession of bomb prohibited," in

violation of HRS § 134–8(a) and as charged in Count II of the indictment against Kane, if the person possesses a bomb. Accordingly, there are two material elements of the offense of "possession of bomb prohibited," as charged, each of which the prosecution would be required to prove beyond a reasonable doubt in order to establish guilt. These two material elements are: (1) that Kane possessed a "bomb"; and (2) that Kane did so intentionally, knowingly, or recklessly. *See supra* note 1; HRS § 702–204 (1993) ("When the state of mind required to establish an element of an offense is not specified by law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly."). Kane alleges that the statute is vague because

> the absence of a clear definition for the word "bomb" requires the person of ordinary intelligence to guess as to what is prohibited. Defining the word "bomb" by constructing [sic] HRS [§ ] 134 only leads to [an] absurd result where a possessor of a single firecracker arguably violates the bomb statute because a "firecracker" and a "bomb" are both "explosives". In this scenario, the firecracker possessor's innocent state of mind is not a defense because HRS [§ ] 134–8 proscribes the mere possession of a "bomb", without regards to whether the possessor has an innocent or criminal intent.
>
> . . . .
>
> The absence of a definition for the word "bomb" leaves HRS [§ ] 134–8 without a standard to adjudge a person guilty of possessing a "bomb". Although[ ] HRS [§ ] 134–8 clearly prohibits the possession of a "bomb[,]" there is no statutory or case law in Hawaii which defines a "bomb" or otherwise fixes a standard to adjudicate a device to be a "bomb". The absence of such a standard allows for the arbitrary and discriminatory application of the statute.

Answering Brief at 10–11.

■ Kane's assessment of Hawai'i case law is incomplete. In *State v. Scott,* 69 Haw. 458, 746 P.2d 976 (1987), this court held that the mandatory imprisonment provision of HRS § 134–8 precluded a sentencing court from suspending the sentence of an individual convicted of its violation, reasoning as follows:

> Prior to 1980, the concern of the legislature over the special danger imposed by gun crime was reflected in the provision of mandatory jail sentences to be applied for violations of HRS Chapter 134. "[S]evere penalties and incarceration" were deemed necessary "as the only meaningful method of stopping gun crimes." Sen. Stand. Comm. Rep. No. 524, reprinted in 1971 Senate Journal at 1036. These mandatory terms of imprisonment, however, were inconsistent with the Penal Code and were not being applied by sentencing judges. Hse. Conf. Comm. Rep. No. 28–80, reprinted in 1980 House Journal at 1084; Sen. Conf. Comm. Rep. No. 30–80, reprinted in 1980 Senate Journal at 955. In view of this inconsistency, the legislature decided in 1980 to remove the mandatory penalties in Chapter 134, *except* as to § 134–8. The mandatory imprisonment provision for violating § 134–8 was retained because
>
> > *[t]he nature of prohibited weapons and related devices being of the type produced basically for the destruction of life and limb,* are such that mandating a sentence of imprisonment is not unwarranted.
>
> *Id.*

*Scott,* 69 Haw. at 459–60, 746 P.2d at 977 (emphasis added). Thus, pursuant to *Scott,* the "bombs" and "other explosives" prohibited by HRS § 134–8(a) are "weapons" that are distinguished by having been "produced basically for the destruction of life and limb." This distinguishing characteristic of the items prohibited by HRS § 134–8 clarifies, for a person of ordinary intelligence, that the critical difference between the mere possession of "a single firecracker" and the possession of a "bomb" prohibited by HRS § 134–8 is the latter's basic and fundamental purpose—causing physical injury, death, or property damage.

The destructive character of the weapons prohibited by HRS § 134–8 is apparent when the statute's provisions are compared with other provisions of the Hawai'i Revised Statutes regulating the manufacture, possession,

and use of fireworks and explosive agents.[3] As a preliminary matter, we note that the global statutory scheme recognizes legitimate uses for explosives in some circumstances. For example, HRS ch. 132D (Supp.1997), entitled "Fireworks," sets out conditions under which they may be legally used. Chapter 132D defines "fireworks" to be

> any combustible or explosive composition, or any substance or combination of substances, or article *prepared for the purpose of producing a visible or audible effect* by combustion, explosion, deflagration or detonation *and* classified as common or special fireworks by the United States Bureau of Explosives or contained in the regulations of the United States Department of Transportation and designated as UN 0335 1.3G or UN 0336 1.4G. The term "fireworks" shall not include automotive safety flares, nor shall the term be construed to include toy pistols, toy cannons, toy guns, party poppers, pop-its or other devices which contain twenty-five hundredths of a grain or less of explosives substance. The term "fireworks" also shall not include any explosives and pyrotechnics regulated under chapter 396.

HRS § 132D–2 (emphases added). This definition makes clear that the characteristic distinguishing a legal "firework" from a prohibited "bomb" is the use to which a "firework" is put: the production of "a visible or audible effect." Thus, contrary to Kane's assertion, the fireworks' possessor's "innocent" intent is *precisely* what places his use of an explosive device under the regulation of HRS ch. 132D and shields him from prosecution pursuant to the provisions of HRS § 134–8.

Similarly, the purpose for which an explosive is used precludes overlap between the devices proscribed by HRS ch. 134 and those regulated by HRS ch. 396. Chapter 396 prohibits, *inter alia*, possession of "explosives" by a person lacking proper certification. *See* HRS § 396–9(f) (1993). While HRS ch. 396, like HRS ch. 134, does not define "explosives," HRS § 396–4(a)(1)

(Supp.1997) authorizes the promulgation of the rules and regulations found in Hawai'i Administration Rules (HAR) Title 12 ("Department of Labor and Industrial Relations"), Subtitle 8 ("Division of Occupational Safety and Health"), Chapter 98 ("Explosives and Blasting Agents"). HAR § 12–98–1 defines an "explosive" as:

> any chemical compound, mixture, or device, the primary purpose or common purpose of which is to function by explosion including, but not limited to, dynamite, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, ignitor cord, [and] ignitors. . . .

Under this definition, the various devices enumerated in HRS § 134–8(a), *see supra* note 1, would arguably constitute "explosives" for purposes of HRS ch. 396. However, by their plain language, HRS chs. 134 and 396 address separate and distinct uses to which "explosives" can be put. HRS ch. 396, which governs "Occupational Safety and Health," sets forth detailed requirements designed to insure the safe manufacture, storage, transportation, and use of "explosives" in commercial, industrial, and building trades settings. On the other hand, HRS ch. 134, which regulates "Firearms, Ammunition and Dangerous Weapons," defines "firearm" as "any *weapon,* for which the operating force is explosive, *including but not limited to . . . bombs,*" thereby emphasizing that the items the possession of which is prohibited by HRS § 134–8 must be designed to produce bodily or other injury, as distinguished from the benign industrial and commercial objectives regulated by HRS ch. 396. *See* HRS § 134–1 (1993).

We note that HRS § 134–8 is not unique in criminalizing the possession of an item for an improper purpose, while, at the same time, permitting possession of the identical item for a legitimate purpose. For example, HRS § 329–43.5 provides in relevant part:

> **Prohibited acts related to drug paraphernalia.** (a) It is unlawful for any person to use, or to possess with intent to use,

---

3. "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of [HRS ch. 329, the "Uniform Controlled Substances Act"].

Hence, while possession of pipes, hypodermic syringes, and gardening tools is not, *per se,* unlawful, possession of these items becomes illegal when coupled with an intent to use them in a manner violative of the Uniform Controlled Substances Act. HRS § 134-8 acts in the same manner with regard to explosives. Possession of a firecracker—or even dynamite, provided that the permits required by HRS ch. 396 have first been obtained—is not, *per se,* unlawful. However, these explosives become "bombs," possession of which is criminalized by HRS § 134-8, when they are kept *for the illegal purpose* of causing injury to a person or property damage.

In light of the foregoing, inasmuch as both the relevant statutory definitions and this court's reasoning in *Scott* establish that HRS § 134-8 prohibits the possession of "weapons" for an illegal purpose, rather than explosive devices and compounds that are used under the conditions and for the purposes set forth in HRS chs. 132 and 396, we hold that HRS § 134-8(a) "describes with reasonable clarity the acts that it proscribes, provides fixed standards for adjudging guilt, and gives a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited so that they may choose between lawful and unlawful conduct." *See Gaylord,* 78 Hawai'i at 142, 890 P.2d at 1182. Accordingly, inasmuch as Kane has not met his burden of plainly, clearly, manifestly, and unmistakably showing unconstitutionality beyond a reasonable doubt, we hold that HRS § 134-8 is not unconstitutionally vague.

### 2. *Overbreadth*

" 'The doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conducted as

well as unprotected conduct is included in its proscriptions.' " *Gaylord,* 78 Hawai'i at 142, 890 P.2d at 1182 (quoting *State v. Kaneakua,* 61 Haw. 136, 143, 597 P.2d 590, 594 (1979)). As an element of its overbreadth analysis, this court has consistently applied the principle that

one who alleges that a statute is unconstitutionally overbroad, other than a statute affecting the freedom of expression, must be directly affected by the claimed overbroad aspects. Put differently, a person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may conceivably be applied unconstitutionally to others.

*Gaylord,* 78 Hawai'i at 142, 890 P.2d at 1182 (citations, brackets, and internal quotation marks omitted).

■ In an effort to avoid the necessity of mounting an "overbroad as applied" challenge, Kane argued in the circuit court that, inasmuch as HRS § 134-8 allegedly prohibited possession of "fireworks," it impermissibly restricted religious expression protected by the first amendment to the United States Constitution. As the discussion of vagueness, *supra,* makes clear, HRS § 134-8 does not prohibit possession of explosives when they are used solely to produce the "visible or audible effect" that characterizes fireworks. Therefore, Kane's attempt to implicate the first amendment fails, and, in order to prevail in his argument that the statute is constitutionally overbroad, he must show that HRS § 134-8 has been unconstitutionally applied to him.

■ The record does not support such a claim. Kane testified that the device he created contained "beebees" and a "shot gun shell." It is inconceivable that these items would be included in a "firecracker" prepared with the intention of producing only a "visible or audible effect." The only plausible purpose of adding projectiles to an explosive is to augment its capacity to cause physical injury. Furthermore, there is no question that Kane was aware of the danger. When asked if he had ever exploded one of his devices, he answered, "No, that's really insane." Kane's response demonstrates that he never contemplated creating a "fire-

cracker" when he built the explosive device found in his truck; accordingly, his conduct does not fall within the hypothetical misapplication of the statute—charging the "innocent" possessor of a single firecracker with possession of a "bomb" under HRS § 134–8.

■ In short, because the statute's prohibition (1) is limited to possession of items intended to be used as "weapons" and (2) does not infringe upon any constitutionally protected activity, we hold that HRS § 134–8 is not unconstitutionally overbroad.

B. *Inasmuch As Officer Veneri Conducted A Custodial Interrogation Of Kane Without First Affording Him The Procedural Safeguards Mandated By Miranda, Kane's Statements To Officer Veneri Are Inadmissible At Trial.*

The circuit court ruled that Kane's statements to Veneri regarding the device found in his truck and its purpose were unlawfully obtained and therefore inadmissible. In this connection, the circuit court entered the following COL:

> That the defendant was in custody prior to being questioned by Officer Veneri and the questions asked of the defendant were designed to illicit [sic] responses which would "evoke an incriminating response". *State v. Melemai* [,] 64 Haw. 479, 643 P.2d 541 (1982); *State v. Ikaika* [,] 67 Haw. 563, 698 P.2d 281 (1985).

The prosecution urges (1) that the foregoing COL is clearly erroneous and (2) that Kane's statements to Officer Veneri pertaining to what the explosive device was and what it was to be used for should be admitted under the "public safety" exception to *Miranda*. These arguments are not persuasive.

An individual accused of a criminal offense enjoys the protections of the fifth amendment to the United States Constitution and article I, section 10 of the Hawai'i Constitution. *State v. Hoey,* 77 Hawai'i 17, 32, 881 P.2d 504, 519 (1994) (citing *State v. Kelekolio,* 74 Haw. 479, 501, 849 P.2d 58, 69 (1993)). In *Hoey,* we set forth the safeguards to which an individual is entitled before being subjected to a custodial interrogation:

*Miranda* imposed upon the prosecution the burden of demonstrating in any given case that these "procedural safeguards" had been employed and described them in relevant part as follows:

> Prior to any [custodial] questioning, the [defendant] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (citing *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612) (brackets in original). We also noted that " 'the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the [Hawai'i] Constitution's privilege against self-incrimination.' " *Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (quoting *State v. Nelson,* 69 Haw. 461, 467, 748 P.2d 365, 369 (1987)) (brackets in original). If the procedural safeguards mandated by *Miranda* are not satisfied, then " 'statements made by the accused may not be used either as direct evidence . . . or to impeach the defendant's credibility[.]' " *Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (quoting *Nelson,* 69 Haw. at 467, 748 P.2d at 369) (ellipsis points in original); *see also State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971). " 'The test to determine if a custodial interrogation ha[s] taken place is whether the investigating officer should have known that his or her words or conduct were reasonably likely to evoke an incriminating response.' " *State v. Roman,* 70 Haw. 351, 357, 772 P.2d 113 (1989) (quoting *State v. Ikaika,* 67 Haw. 563, 698 P.2d 281 (1985)).

■ It is uncontroverted that Kane was in custody when he was questioned by Officer Veneri. He had been arrested, was handcuffed, and was sitting in a patrol car at the time. It is also apparent that, *before* he approached Kane, Officer Veneri knew that the device he had found in Kane's fanny pack was an explosive, the possession of which was a crime. Hence, Officer Veneri should have known that the questions that he posed to Kane were likely to elicit an incriminating response. Under these circumstances, Kane was subjected to a custodial interrogation.

Accordingly, the holdings of both this court and the United States Supreme Court require that, inasmuch as he was not first informed of his rights protected by article I, section 10 of the Hawai'i Constitution and the fifth amendment to the United States Constitution, his statements to Officer Veneri must be suppressed.

██ The prosecution next argues that, even if Kane was subjected to a custodial interrogation without being informed of his *Miranda* rights, his statements are, nevertheless, admissible under the "public safety" exception to *Miranda*. This argument, however, fails for two reasons. First, while the United States Supreme Court has adopted the "public safety" exception as a limitation on the procedural safeguards necessary for the protection of the rights afforded by the fifth amendment to the United States Constitution, this court has never formally adopted an analogous limitation on the protections afforded to criminal defendants by article I, section 10 of the Hawai'i Constitution. Second, on the facts of this case, the "public safety" exception to the *Miranda* requirements, as set forth by the United States Supreme Court in *Quarles, supra,* is not applicable and, therefore, cannot render Kane's statements admissible even under federal constitutional analysis.

In *Quarles,* the police apprehended a suspected rapist after a chase through a supermarket. Because the victim had indicated that her assailant had carried a gun, the police searched him for the weapon, but found only an empty shoulder holster. Concerned that the unlocated gun posed a threat to public safety, the arresting officer immediately asked, before reading the suspect his *Miranda* rights, where the gun was. When the suspect told him, the officer first retrieved the gun and, only afterward, formally arrested the suspect and informed him of his fifth amendment rights as required by *Miranda*. The *Quarles* Court reasoned that the exigency created by having a gun freely available in a public place, where it could be found by and cause injury to anyone in the area, justified the police in questioning the suspect for the limited purpose of neutralizing the immediate danger without first giving the warnings required by *Miranda*.

*Quarles* is inapposite to this case. Unlike the police officer in *Quarles,* Officer Veneri had ascertained the location of Kane's device and was aware that it was an explosive. Armed with this knowledge, Officer Veneri did not require additional information from Kane in order to verify the need to call the bomb squad. Accordingly, Officer Veneri's questions cannot be said to have been designed solely for the purpose of addressing the danger posed by the explosive. The "public safety" exception to *Miranda* being inapplicable to this case, we hold that Kane's answers to Officer Veneri's questions pertaining to what the explosive was and why Kane was in possession of it are inadmissible in evidence.

## IV. CONCLUSION

For the foregoing reasons, we affirm the portion of the circuit court's order granting Kane's motion to suppress statements. However, we reverse the portion of the order dismissing count II of the indictment and remand this case for further proceedings.