87 P.3d 893

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Samuel NAITITI, Defendant–Appellee.**

No. 25779.

Supreme Court of Hawai'i.

April 12, 2004.

226

Alexa D.M. Fujise, Deputy Prosecuting Attorney, on the briefs, for the plaintiff-appellant State of Hawai'i.

Deborah L. Kim, Deputy Public Defender, on the briefs, for the defendant-appellee Samuel Naititi.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ., with ACOBA, J., concurring separately and dissenting.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant State of Hawai'i [hereinafter, "the prosecution"] appeals from the findings of fact (FOFs), conclusions of law (COLs), and order of the first circuit court, the Honorable Sandra A. Simms presiding, ruling that certain statements that the defendant-appellee Samuel Naititi made to Honolulu Police Department (HPD) Detective Phillip Lavarias were involuntary, within the meaning of Hawai'i Revised Statutes (HRS) § 621–26 (1993),[1] and therefore inadmissible at trial. As a threshold matter, the prosecution asserts that it is entitled to appeal the circuit court's order as a matter of right, pursuant to HRS § 641–13(7) (1993).[2] On the merits, the prosecution contends that the circuit court erred in suppressing Naititi's statements because: (1) they were not the product of "interrogation" and, therefore, the mandate of *Miranda v. Arizona*, 384 U.S.

436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was not implicated; and (2) they were communicated spontaneously—albeit nonresponsively to Detective Lavarias's preliminary inquiry as to whether Naititi wished to make a statement—and, accordingly, were voluntarily made, whether Naititi understood Detective Lavarias's preliminary question or not.

Naititi responds (1) that the prosecution lacked the right of direct appeal conferred by HRS § 641–13(7) and that this court therefore is without jurisdiction to entertain the present matter and (2) that, in any event, the circuit court correctly excluded Naititi's un-*Mirandized* custodial and involuntary statements.

We hold that the circuit court's order foreclosing the admission of Naititi's statements into evidence is the functional equivalent of a "pretrial order granting a motion for the suppression of evidence," within the meaning of HRS § 641–13(7), and that we have jurisdiction to consider the prosecution's appeal. On the merits, we hold that Naititi's "confession" was "voluntarily made" for purposes of HRS § 621–26 and that his right to *Miranda* warnings had not ripened as of the time he "confessed" because, although Naititi was clearly "in custody," Detective Lavarias had not yet subjected him to "interrogation." Accordingly, we vacate the circuit court's

1. HRS § 621–26 provides that "[n]o confessions shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made."

2. HRS § 641–13 provides:
 **By State in criminal cases.** *An appeal may be taken by and on behalf of the State* from the district or circuit courts to the supreme court, subject to chapter 602, *in all criminal cases*, in the following instances:
 (1) From an order or judgment quashing, setting aside, or sustaining a motion to dismiss, any indictment or complaint or any count thereof;
 (2) From an order or judgment, sustaining a special plea in bar, or dismissing the case where the defendant has not been put in jeopardy;
 (3) From an order granting a new trial;
 (4) From an order arresting judgment;
 (5) From a ruling on a question of law adverse to the State where the defendant was convicted and appeals from the judgment;

 (6) From the sentence, on the ground that it is illegal;
 (7) *From a pretrial order granting a motion for the suppression of evidence, including a confession or admission,* or the return of property in which case the intermediate appellate court or the supreme court, as the case may be, shall give priority to such an appeal and the order shall be stayed pending the outcome of the appeal;
 (8) From an order denying a request by the State for protective order for nondisclosure of witness for their personal safety under Rule 16(e)(4) of the Hawai'i Rules of Penal Procedure, in which case the intermediate appellate court or the supreme court, as the case may be, shall give priority to such appeal and the order shall be stayed pending outcome of such appeal;
 (9) From a judgment of acquittal following a jury verdict of guilty.
 (Emphases added.)

FOFs, COLs, and order ruling that Naititi's statements to Detective Lavarias were involuntary, and remand this matter to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

On June 12, 2002, an Oʻahu Grand Jury returned an indictment against Naititi charging him with two counts of sexual assault in the third degree, in violation of HRS § 707–732(1)(b) (1993).[3] On April 16, 2003, Naititi filed a motion *in limine* urging the circuit court to enter an order excluding the evidentiary use at trial of all of Naititi's pretrial statements made to Detective Lavarias and any testimony that Detective Lavarias might otherwise give regarding Naititi's utterances.

On April 17, 2003, the prosecution filed a motion to determine the voluntariness of Naititi's statements [hereinafter, "the prosecution's motion"], pursuant to HRS § 621–26, *see supra* note 1, wherein the prosecution sought to establish the admissibility at trial of allegedly incriminating statements that Naititi, who is deaf and mute, uttered by sign language to Detective Lavarias through a sign language interpreter.

### A. *The Voluntariness Hearing*

The circuit court conducted a hearing on the prosecution's motion to determine voluntariness on April 21, 2003. Prior to addressing the prosecution's motion, the circuit court allowed the deputy public defender (DPD) to clarify Naititi's motion *in limine* seeking an order of exclusion; the DPD explained that the motion pertained to the statements that Naititi made at the police station. The circuit court ruled, with regard to Naititi's statements, that the issue was being taken up by the prosecution's motion to determine voluntariness.

Turning to the prosecution's motion, the circuit court heard the testimony of Detective Lavarias and Hugh Prickett, an American Sign Language (ASL) interpreter, regarding the custodial interview of Naititi, which occurred on June 5, 2002. It was undisputed that Prickett was a well-qualified ASL interpreter. Prickett testified that he received a referral from Hawaiʻi Services on Deafness on June 5, 2002, directing him to the HPD police station on Beretania Street to interview a deaf suspect. Prickett recounted that he was introduced to Naititi in an interview room at the police station and that he interpreted everything that Detective Lavarias said to Naititi. Prickett then testified that Naititi signed "sorry," demonstrating the sign from the witness stand. Prickett testified that Detective Lavarias next "said something about [']we want to ask you a few questions['] and something about the ... right to have a lawyer.... [Naititi] continued to talk as if he just was not responding to what ... the detective was saying to him." Prickett interpreted Naititi's signing to signify "touch not," which Prickett interpreted to mean "touch but did not penetrate." Prickett opined, based on his observations, that Naititi did not understand Prickett's ASL gestures and signs and that Naititi was "[d]efinitely not responsive." Finally, Prickett testified that "the detective said, 'We have to stop this [interview] now,' and that was the end of it."

Detective Lavarias identified Naititi and described the circumstances giving rise to his investigation. The deputy prosecuting attorney (DPA) asked Detective Lavarias whether he was aware of a "special accommodation that needed to be met in order to possibly get an interview from [Naititi]." Detective Lavarias responded that he understood Naititi was deaf and, therefore, that he procured the services of an ASL interpreter. Detective Lavarias further testified as follows:

> [Detective Lavarias]: [M]r. Prickett arrived and I sat him down in the interview room. I went downstairs to the cellblock to get Mr. Naititi. I brought him upstairs to the second floor and we all sat down in the CID interview room.

---

**3.** HRS § 707–732(1)(b) provides:
 (1) A person commits the offense of sexual assault in the third degree if:
 ....

 (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]

[DPA]: Okay. What do you recall happening after you came and the three of you were in the room together?

[Detective Lavarias]: Well, at that time I asked Mr. Prickett to ask Mr. Naititi if he wanted to make a statement to me today.

[DPA]: Okay. And you've already told us that you don't speak [ASL], but did it appear to you that Mr. Prickett signed something to [Naititi]?

[Detective Lavarias]: Yes.

[DPA]: Okay. Based on what you observed did [Naititi] gesture or sign anything back to Mr. Prickett?

[Detective Lavarias]: Yes.

[DPA]: Did Mr. Prickett translate this to you?

[Detective Lavarias]: Yes, he did.

[DPA]: What do you recall the translation being?

[Detective Lavarias]: "I'm sorry. I'm sorry."

[DPA]: What did you do at that time?

[Detective Lavarias]: [A]t that time I stopped, ... instructed Mr. Prickett to stop him, and I asked Mr. Prickett to ask Mr. Naititi if he wanted an attorney at that time.

. . . .

[DPA]: So there were no other questions between "I'm sorry" and "Do you want an attorney?"

[Detective Lavarias]: No.

[DPA]: [D]id it appear that Mr. Prickett gestured or signed something to [Naititi]?

. . . .

[Detective Lavarias]: Yes. The response—well, Mr. Naititi responded in sign language and that was translated by Mr. Prickett. And he translated it as saying "I'm sorry" again. "I only touched her vagina."[⁴]

4. The discrepancy between Detective Lavarias's testimony as to the content of Naititi's allegedly incriminating statements and Prickett's interpretation of them is not at issue in the present matter.

5. HRS § 641–17 provides:
 **Interlocutory appeals from circuit courts, criminal matters.** Upon application made

. . . .

[DPA]: [W]hat did you decide to do next?

[Detective Lavarias]: I decided to terminate the interview at that time.

[DPA]: Why is that?

[Detective Lavarias]: Because it appeared Mr. Naititi didn't understand what I was asking of him.

On the same day, the circuit court orally ruled that Naititi's utterances were "not voluntary" and therefore inadmissible at trial on the dual grounds that they were made before Naititi had been *Mirandized* and that, *Mirandized* or not, the statements were made without "understanding." With regard to the first ground, the circuit court adhered to the view that Naititi was entitled to "be advised of [his] *Miranda* rights before even being asked whether or not he wanted to make a statement[.]"

B. *Prosecution's Notice Of Appeal And Stay Of Proceedings*

On April 22, 2003, the prosecution filed its notice of appeal from the circuit court's April 21, 2003 oral ruling on its motion to determine voluntariness. On April 23, 2003, prior to jury selection, the circuit court addressed the prosecution's notice of appeal. The prosecution asserted that the circuit court was divested of jurisdiction to conduct any further trial proceedings, inasmuch as the circuit court's oral ruling was the functional equivalent of an order granting a motion to suppress Naititi's statements, which thereby enabled the prosecution to exercise its right of direct appeal pursuant to HRS § 641–13(7) *see supra* note 2. The prosecution disputed the circuit court's suggestion that the prosecution's appeal was interlocutory, pursuant to HRS § 641–17 (1993).⁵ Nevertheless, the circuit court ruled as follows:

within the time provided by the rules of the supreme court, an appeal in a criminal matter may be allowed *to a defendant* from the circuit court to the supreme court, subject to chapter 602, from a decision denying a motion to dismiss or from other interlocutory orders, decisions, or judgments, whenever the judge in the judge's discretion may think the same advisa-

THE COURT: [T]he court is clear that this is not a matter for which appeal can be taken at this point in time. Certainly the [prosecution] is entitled to raise certain issues before the appellate court. This is an interlocutory matter which requires the court's approval. The court has not granted such approval.

In addition[,] appeal can only be taken from an order that is filed with this court, and again[,] no such order has been filed. Again this is a matter that was brought to the court's attention in a motion for determination of voluntariness at the time of trial, and certainly one of the issues that [is] raised whenever the court is called upon to consider whether or not an interlocutory kind of decision ought to—gives rise to the [prosecution]'s exercise of its right to take up an appeal is when there is an issue that is presented prior to trial that is likely to be an important issue that the court should consider during the course of trial.

Now clearly that encompasses matters that are pretrial ... such as suppressions.... Dismissals are clearly the types of things. Those things can be taken, but the determination of voluntariness prior to trial clearly does not fall into that category. [T]his is not a motion to suppress, [which,] as counsel has indicated ... would be filed by the defense in any event.

[I]'m not sure [the prosecution's] even appealing the suppression of [Naititi's] statement which the court clearly did not do. There being no order, this does not confer jurisdiction on the Supreme Court nor deprive this court of jurisdiction. So the court is satisfied we can proceed.

On the afternoon of April 23, 2003, the prosecution filed a petition in this court for a writ of prohibition, directing Judge Simms to suspend all ongoing proceedings in the present matter pending the prosecution's appeal or, in the alternative, for a stay. This court granted the prosecution's petition.

ble for a more speedy termination of the case. The refusal of the judge to allow an interlocutory appeal to the appellate court shall not be reviewable by any other court.

C. *The Circuit Court's FOFs, COLs And Order Determining That Naititi's Statements Were Not Voluntary*

On April 29, 2003, the circuit court entered its FOFs, COLs, and order determining that Naititi's statements to Detective Lavarias were not voluntarily made. For present purposes, the following FOFs and COLs are relevant:

## FINDINGS OF FACT

. . . .

3. [Naititi] is deaf and mute and does not use [American Sign Language (ASL)], but communicates in a limited manner through a sort of pidgin sign language.

4. [Naititi] does not read.

5. [Naititi] was arrested on June 4, 2002.

6. On June 5, 2002, Detective Phillip Lavarias (Detective Lavarias) of the Honolulu Police Department brought [Naititi] to an interview room at the police station in order to attempt to interview him.

7. Detective Lavarias obtained the services of an [American Sign Language] (ASL) interpreter from the Hawai'i Services on Deafness (HSOD), a referral service for interpreters for the deaf.

8. ASL interpreter Hugh Prickett (Prickett) was assigned by HSOD to assist Detective Lavarias. Prickett has impeccable credentials in the use and teaching of ASL.

. . . .

12. Detective Lavarias, through Prickett's ASL, asked [Naititi] if he wanted to make a statement.

13. [Naititi] responded to these signs by making a universal sign language sign for "I'm sorry" several times.

14. The sign was made by rubbing his clenched fist upward in a circular motion against his sternum with his thumb extended.

15. Detective Lavarias instructed Prickett to stop [Naititi].

(Emphasis added.)

16. Detective Lavarias then asked Prickett to ask [Naititi] if he wanted an attorney to be present during the interview.

17. Prickett signed the question to [Naititi] in ASL.

18. Prickett told Detective Lavarias that he believed [Naititi] had responded in ASL, "I only touched. I did not penetrate."

19. It did not appear to Detective Lavarias that [Naititi] understood Prickett's inquiry about having an attorney present.

20. Prickett then informed Detective Lavarias that [Naititi] was not able to understand ASL and could not read.

21. Detective Lavarias believed [Naititi] could not understand his constitutional rights, and no further statement was taken from [Naititi].

### CONCLUSIONS OF LAW

1. On June 5, 2002, [Naititi] was in custody when he was taken into the police station's interview room.

2. On June 5, 2002, prior to [Naititi]'s appearance in the interview room, the police had identified [Naititi] as the suspect who placed his hands on a minor female's vagina and buttocks on June 1, 2002.

3. As a matter of law, [Naititi], whom the police had already identified as the suspect, was entitled to be informed of his constitutional rights before Detective Lavarias asked the preliminary question of whether he wanted to make a statement.

4. Because [Naititi] was not informed of his constitutional rights, and therefore did not waive them, [Naititi]'s statements to Detective Lavarias in response to the question of whether he ( [Naititi] ) wanted an attorney were not voluntarily made and can not be used at trial.

5. Furthermore, under the totality of the circumstances, [Naititi]'s statements to Detective Lavarias could not have been voluntarily made because [Naititi] could not understand the questions posed to him, as interpreted by Prickett.

The prosecution's April 22, 2003 notice of appeal is deemed to have been filed when the circuit court's order was entered on April 29, 2003 and is a timely appeal pursuant to Hawai'i Rules of Appellate Procedure (HRAP) 4(b)(4) (2003).[6]

## II. STANDARDS OF REVIEW

### A. Jurisdiction

■■■ "The existence of jurisdiction is a question of law that we review *de novo* under the right/wrong standard." *Amantiad v. Odum,* 90 Hawai'i 152, 158, 977 P.2d 160, 166 (1999) (quoting *Lester v. Rapp,* 85 Hawai'i 238, 241, 942 P.2d 502, 505 (1997)) (internal quotation marks omitted). Regarding appellate jurisdiction, this court has noted,

> [J]urisdiction is "the base requirement for any court resolving a dispute because without jurisdiction, the court has no authority to consider the case." *Housing Finance & Dev. Corp. v. Castle,* 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995). With regard to appeals, "[t]he remedy by appeal is not a common law right and exists only by virtue of statutory or constitutional provision." *In re Sprinkle & Chow Liquor License,* 40 Haw. 485, 491 (1954). Therefore, "the right of appeal is limited as provided by the legislature and compliance with the methods and procedure prescribed by it is obligatory." *In re Tax Appeal of Lower Mapunapuna Tenants' Ass'n,* 73 Haw. 63, 69, 828 P.2d 263, 266 (1992).

*TSA Int'l Ltd. v. Shimizu Corp.,* 92 Hawai'i 243, 265, 990 P.2d 713, 735 (1999).

*State v. Bohannon,* 102 Hawai'i 228, 232, 74 P.3d 980, 984 (2003) (quoting *State v. Adam,* 97 Hawai'i 475, 481, 40 P.3d 877, 883 (2002)).

### B. Statutory Interpretation

■■■ "[T]he interpretation of a statute . . . is a question of law reviewa-

---

6. HRAP 4(b)(4) provides:

PREMATURE NOTICE OF APPEAL. A notice of appeal filed after the announcement of a decision, or order but before entry of the judg-

ment or order shall be deemed to have been filed on the date such judgment or order is entered.

ble de novo." *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (*quoting State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704 (1994) . . . .

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists . . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1993) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (*quoting State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2)(1993). "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Kaua,* 102 Hawai'i 1, 7, 72 P.3d 473, 479 (2003) (quoting *Rauch,* 94 Hawai'i at 322–23, 13 P.3d at 331–32) (quoting *State v. Kotis,* 91 Hawai'i 319, 327, 984 P.2d 78, 86 (1999) (quoting *State v. Dudoit,* 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker,* 90 Hawai'i 85, 90–91, 976 P.2d 399, 404–05 (1999) (quoting *Ho v. Leftwich,* 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)))))))(ellipsis points and brackets in original).

*"[T]he legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality."* *State v. Griffin,* 83 Hawai'i 105, 108 n. 4, 924 P.2d 1211, 1214 n. 4 (1996) (quoting *State v. Malufau,* 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citations and internal quotation marks omitted)) (brackets and internal quotation marks omitted). *See also* HRS § 1–15(3) (1993) (*"Every construction which leads to an absurdity shall be rejected."*).

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590.

*State v. Haugen,* 104 Hawai'i 71, 76–77, 85 P.3d 178, 182–183 (2004) (quoting *State v. Cornelio,* 84 Hawai'i 476, 484, 935 P.2d 1021, 1029 (1997) (emphases added)) (some brackets added and some in original).

### C. *Questions Of Constitutional Law*

██ "We answer questions of constitutional law 'by exercising our own independent judgment based on the facts of the case,' " and, thus, questions of constitutional law are reviewed on appeal "under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted).

*Kaua,* 102 Hawai'i at 7, 72 P.3d at 479 (quoting *State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001)).

### D. *Findings Of Fact/Conclusions Of Law*

 [This Court] review[s] a circuit court's findings of fact in a pretrial

ruling according to the following standard:

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. *State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995) (citations and internal quotation marks omitted). "The circuit court's conclusions of law are reviewed under the right/wrong standard." *State v. Pattioay,* 78 Hawai'i 455, 459, 896 P.2d 911, 915 (1995) (citation omitted).

*State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (quoting *State v. Harada,* 98 Hawai'i 18, 22, 41 P.3d 174, 178 (2002) (quoting *State v. Wilson,* 92 Hawai'i 45, 48, 987 P.2d 268, 271 (1999))).

## III. *DISCUSSION*

A. *This Court Has Jurisdiction To Entertain The Prosecution's Appeal Of The Circuit Court's Order Pursuant To HRS § 641–13(7).*

██ The prosecution maintains that it may appeal the suppression of evidence as a matter of right pursuant to HRS § 641–13(7), *see supra* note 2. Naititi retorts that, by virtue of the statute's plain language, the prosecution does not have a right of automatic appeal, arguing "that the [prosecution] may only appeal from a 'pretrial order granting a motion for the suppression of evidence, including a confession or admission.'" More specifically, Naititi asserts that a strict construction of the statute allows the prosecution to appeal only an order granting a defendant's motion to suppress evidence and not an adverse determination of a motion to determine voluntariness initiated by the prosecution. We agree with the prosecution.

██ "The right of appeal in a criminal case is purely statutory and exists only when given by some constitutional or statutory provision." *Grattafiori v. State,* 79 Hawai'i 10, 13, 897 P.2d 937, 940 (1995). "The [prosecution's] right to appeal in a criminal case is limited to those instances set forth in HRS § 641–13." *State v. Dannenberg,* 74 Haw. 75, 78, 837 P.2d 776, 778, *reconsideration denied,* 843 P.2d 144 (1992). This court has adhered to the principle that "[s]tatutes granting the State the right of appeal in criminal cases must be strictly construed. They are not to be enlarged by construction and cannot be extended beyond their plain terms." *State v. Kirn,* 70 Haw. 206, 208, 767 P.2d 1238, 1240 (1989). In applying the rule of strict construction, this court examines the substance, not the form, of the matter to determine whether the prosecution may appeal it under HRS § 641–13. *State v. Poohina,* 97 Hawai'i 505, 509, 40 P.3d 907, 911 (2002) (noting that this court "has cautioned against raising form over substance").

██ Although orders suppressing evidence typically result from motions to suppress filed by defendants, trial courts are authorized to enter such orders when the admissibility of a confession is at issue under HRS § 621–26, *see supra* note 1. Pursuant to HRS § 621–26, the trial court *must* make a determination of the voluntariness of a defendant's statements, and the failure to do so constitutes reversible error. *See State v. Green,* 51 Haw. 260, 264, 457 P.2d 505, 508 (1969) ("[T]he trial judge has the duty to determine the admissibility of an inculpatory statement out of the presence of the jury and prior to the jury's exposure to such evidence."). Whether a motion to determine the voluntariness of a confession is initiated by the prosecution, the defense, or *sua sponte* by the trial court, is ultimately immaterial to the statutory requirement of a voluntariness hearing. *Cf. Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (holding that failure to conduct hearing into voluntariness of defendant's confession amounted to denial of due process in violation of fourteenth amendment to the United States Constitution). Notwithstanding the language of *State v. White,* 1 Haw. App. 221, 222–23, 617 P.2d 98, 100 (1980), implying that HRS § 621–26 was simply a

codification of the United States Supreme Court's decision in *Jackson*, the statute's history reveals that it predated *Jackson* by nearly thirty-seven years. *See State v. Bowe*, 77 Hawai'i 51, 61, 881 P.2d 538, 548 (1994) (Klein, J., concurring). "[R]eliance on the 'leading authorities' demonstrates that HRS § 621–26 was essentially a codification of the common law rule against coerced confessions." *Id.*

In *State v. Luton*, 83 Hawai'i 443, 927 P.2d 844 (1996), this court determined that the prosecution, pursuant to HRS § 641–13(7), was entitled to appeal an order, which arose out of a defendant's motion *in limine* regarding the voluntariness of his statements to the police and which suppressed them, as an "order granting a motion for the suppression of evidence" because the motion *in limine* was "functionally" a motion to suppress evidence. *Id.* at 445 n. 3, 927 P.2d at 846 n. 3. Analogously, in *Poohina*, we held that a dismissal of the charge against a defendant ordered *sua sponte* by the trial court was appealable by the prosecution pursuant to HRS § 641–13(1) as an "order sustaining a motion to dismiss," notwithstanding that the order was not entered in response to a motion filed by the defendant. 97 Hawai'i at 510, 40 P.3d at 912.

█ This court has departed from literal interpretations of "plain, obvious, and unambiguous" statutes under the following conditions:

"[T]his court is ... willing to look beyond the plain, obvious, and unambiguous language of a statute, the facial constitutionality of which is not at issue, for the purpose of ascertaining its underlying legislative intent, but only if *a literal construction 'would produce an absurd and unjust result.'* " *State v. Buch*, 83 Hawai'i 308, 326–27, 926 P.2d 599, 617–18 (1996) (Levinson, J., concurring and dissenting) (citing *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 773 P.2d 250 (1989), and *Franks v. City and County of Honolulu*, 74 Haw. 328, 843 P.2d 668 (1993)) (emphasis in original) (footnote omitted). *See also* HRS § 1–15(3) (1993) (providing that

"*[e]very construction which leads to an absurdity shall be rejected* ").

*Haugen*, 104 Hawai'i at 77, 85 P.3d at 183 (quoting *State v. Dudoit*, 90 Hawai'i 262, 270, 978 P.2d 700, 708 (1999)) (emphases added).

HRS § 641–13(7) describes in "plain, obvious, and unambiguous" terms the scope of the prosecution's right to appeal in criminal cases "[f]rom a pretrial order granting a motion for the suppression of evidence, including a confession or admission...." *See supra* note 2. It is undisputed that the prosecution is appealing from an HRS § 621–26 order determining that Naititi's statements were involuntary and not an order granting a defendant's motion to suppress. Thus, based on the "plain and obvious meaning" of HRS § 641–13(7), the prosecution's appeal of the circuit court's disposition of its own motion to determine voluntariness would not seem to fall within the purview of the statute. As we have previously stated, however, "the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *Cornelio*, 84 Hawai'i at 484, 935 P.2d at 1029 (internal quotation signals and citations omitted). A literal construction of HRS § 641–13(7) would produce just such an absurd result, which would be inconsistent with and contrary to the manifest intent of HRS § 641–13(7), which is to allow the prosecution to seek review of an order that suppresses confessions.

As we noted *supra* in section I.A, the circuit court expressly stated in the course of the April 21, 2003 hearing that the issues raised in Naititi's motion *in limine* were already being addressed in the context of prosecution's motion to determine voluntariness. Thus, it was unnecessary for Naititi to file his motion *in limine*, because the prosecution was already required, pursuant to HRS § 621–26, to move for a hearing to determine voluntariness. Under the circumstances, where a *confession*, rather than a mere incriminating statement, is elicited from a suspect, and the prosecution *must* move for a determination of voluntariness prior to the admission of the confession at trial rather than require the defendant to move for suppression of a statement, it would

be absurd to construe HRS § 641–13(7) to preclude the prosecution from appealing the trial court's resulting order.

Based on the foregoing, we hold that HRS § 641–13(7) authorizes the prosecution to appeal orders suppressing evidence as illegally obtained, the intent of the statute being to facilitate the administration of justice in criminal cases by allowing the prosecution to obtain a conclusive ruling on issues involving searches, seizures, and confessions via direct appeal. We therefore hold that the language of HRS § 641–13(7), which allows the prosecution to appeal from "a pretrial order granting a motion for the suppression of evidence," includes within its scope the right to appeal from a trial court's voluntariness determination mandated by HRS § 621–26. The circuit court's April 29, 2003 order prohibiting the prosecution from introducing Naititi's statements to Detective Lavarias into evidence was an order that suppressed evidence on the basis of an allegedly unlawfully obtained confession. It was therefore an order that the prosecution could appeal pursuant to HRS § 641–13(7).

B. *The Circuit Court Erred In Determining That Naititi's Statements To Detective Lavarias Were Involuntary Because, Notwithstanding That Naititi Was In Custody, He Was Not Subjected To Interrogation.*

 On the merits, the prosecution argues that Naititi "was not subject to interrogation when he made voluntary, spontaneous, and non-responsive statements" to Detective Lavarias during his June 5, 2002 interview. The prosecution does not dispute that Naititi was "in custody" at the time; rather, the prosecution maintains that the admissibility of Naititi's statements turns on whether he was "interrogated" for purposes of triggering the obligation to give *Miranda* warnings. We agree with the prosecution.

 It is a fundamental tenet of criminal law that "the prosecution may not use *statements*, whether exculpatory or inculpa-

tory, *stemming from custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." [7] *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602 (emphases added).

The *"Miranda* rule[ ]" . . . is, at core, a constitutionally prescribed rule of evidence that requires the prosecution to lay a sufficient foundation—i.e., that the requisite warnings were administered and validly waived before the accused gave the statement sought to be adduced at trial—before it may adduce evidence of a defendant's custodial statements that stem from interrogation during his or her criminal trial. . . .

*The prosecution's burden of establishing that the requisite warnings were given, however, is not triggered unless the totality of the circumstances reflect that the statement it seeks to adduce at trial was obtained as a result of "custodial interrogation,"* which, as the United States Supreme Court defined it in *Miranda*, consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. 1602 [16 L.Ed.2d 694] (footnote omitted); *see also [State v.] Hoey*, 77 Hawai'i [17,] 33, 881 P.2d [504,] 520 [ (1994) ] ("the privilege [against self-incrimination] is jeopardized when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and subjected to questioning") (citations, original ellipsis points, and internal quotations signals omitted); *State v. Melemai*, 64 Haw. 479, 481, 643 P.2d 541, 543 (1982); *State v. Patterson*, 59 Haw. 357, 359, 581 P.2d 752, 754 (1978). In other words, the defendant, objecting to the admissibility of his or her statement and, thus, seeking to suppress it, must establish that his or her statement was the result of (1) "interrogation" that occurred while he or she was (2) "in cus-

---

7. A suspect must be advised "of his right to remain silent, that anything he says can and will be used against him, that he has the right to have an attorney present, and that if he cannot afford an

counsel, one will be appointed for him prior to any interrogation." *State v. Kalai*, 56 Haw. 366, 368, 537 P.2d 8, 11 (1975) (construing *Miranda*, 384 U.S. at 467–74, 86 S.Ct. 1602).

tody." *See, e.g., [State v.] Ah Loo*, 94 Hawai'i [207,] 210, 10 P.3d [728,] 731 [ (2000) ]("the requirement of *Miranda* warnings is triggered by 'two criteria': '(1) the defendant must be under interrogation; and (2) the defendant must be in custody'" (quoting *State v. Kauhi*, 86 Hawai'i 195, 204, 948 P.2d 1036, 1045 (1997) (quoting *State v. Blanding*, 69 Haw. 583, 586, 752 P.2d 99, 100 (1988))) (original brackets omitted)).

. . . .

*Generally speaking, "'interrogation,' as used in a Miranda context, [means] 'express questioning or its functional equivalent.'"* *Ah Loo*, 94 Hawai'i at 210, 10 P.3d at 731 (quoting *Melemai*, 64 Haw. at 481 n. 3, 643 P.2d at 544 n. 3 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))) (some internal quotation signals omitted) (brackets in original). However, *whether a police officer has subjected a person to "interrogation" is determined by objectively assessing the "totality of the circumstances." Id.; see also [State v.] Ikaika,* 67 Haw. [563,] 567, 698 P.2d [281,] 284 [ (1985) ]. With a focus upon the conduct of the police, the nature of the questions asked, and any other relevant circumstance, the *ultimate question becomes "whether the police officer should have known that his [or her] words or actions were reasonably likely to elicit an incriminating response" from the person in custody. Ikaika,* 67 Haw. at 567, 698 P.2d at 284.

*Ketchum*, 97 Hawai'i at 117–119, 34 P.3d at 1016–1018 (emphases added) (some brackets added and some in original) (footnotes omitted).

▪▪▪▪ For present purposes, the foregoing analytical framework is subject to two refinements. First, "volunteered confessions or admissions, obtained independent of express police questioning or its functional equivalent, are admissible." *Ikaika*, 67 Haw. at 566, 698 P.2d at 284 (quoting *State v. Paahana*, 66 Haw. 499, 502, 666 P.2d 592, 595 (1983)). Second,

we have recognized that one of the basic considerations underlying the exclusion of confessions obtained through coercion is the "inherent untrustworthiness of involuntary confessions." *[State v.] Kelekolio*, 74 Haw. [479,] 502, 849 P.2d [58,] 69 [ (1993) ]. An involuntary confession is inherently untrustworthy because the free will of an individual is overborne by the external influence exerted in obtaining it.

. . . .

Although we have previously stated that "[t]he touchstone of due process is protection of the individual against arbitrary action of the government," *[State v.] Bernades*, 71 Haw. [485,] 487, 795 P.2d [842,] 843 [ (1990) ] (citation omitted), we have also stated that the due process clause [of article I, section 5 of the Hawai'i Constitution] serves to "protect the right of the accused in a criminal case to a fundamentally fair trial." *State v. Matafeo*, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990). Implicit in a "fundamentally fair trial" is a right to make a meaningful choice between confessing and remaining silent.

. . . .

. . . Therefore, . . . admitting coerced confessions, regardless of the source of the coercion, is fundamentally unfair.

*State v. Bowe*, 77 Hawai'i 51, 59, 881 P.2d 538, 546 (1994) (rejecting the "narrow focus on police coercion" reflected in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)) (some brackets added and some in original) (footnote omitted).

Naititi relies heavily on *Bowe* as support for his position that the questions posed by Detective Lavarias at the outset of the June 5, 2002 interview—namely, whether Naititi wished to make a statement and avail himself of the services of an attorney—were, in the absence of *Miranda* warnings, coercive in nature, thereby rendering his responses involuntary and inadmissible at trial. Naititi's reliance is misplaced.

In *Bowe*, an officer of the HPD enlisted the assistance of the head coach of the University of Hawai'i men's varsity basketball team in producing the defendant—a team member—for questioning in connection with an assault that had recently occurred in a campus dormitory. The coach accompanied

the defendant to the police station, where the "[d]efendant was given *Miranda* warnings and subsequently signed an HPD Form 81, waiving his constitutional rights to counsel and to remain silent," after which, in the course of custodial interrogation, the defendant admitted committing the offense. 77 Hawai'i at 53, 881 P.2d at 540. According to the circuit court's uncontroverted conclusion of law, however, the defendant's statement to the interrogating police officer "was not the product of his rational intellect and free will because [he] feared that if he did not follow [his coach's] direction [to submit to police questioning], he would be suspended from the Basketball Team[.]" *Id.* Thus, the circuit court concluded that the defendant's "statement, being involuntary," was "barred from being received in evidence under [HRS] § 621–26." *Id.* (brackets in original). On appeal by the prosecution, we held "that the circuit court did not err in concluding as a matter of law that [the][d]efendant's confession was involuntary after finding coercive conduct" by the coach, whom the circuit court found, " 'as head basketball coach, had the authority to suspend athletes or remove them from the Basketball Team and, in the case of scholarship-athletes, to initiate procedures to withdraw their athletic scholarships.' " 77 Hawai'i at 60, 881 P.2d at 547. We therefore additionally held, notwithstanding that the defendant had been fully *Mirandized* prior to giving his statement to the police, "that the circuit court properly concluded that [the][d]efendant's confession was involuntary and hence inadmissible." *Id.*

It should be apparent from the foregoing that the *Bowe* analysis, which focuses upon the question whether a defendant's right to due process, as guaranteed by article I, section 5 of the Hawai'i Constitution, has been infringed via the extraction of a confession through coercion, is a gloss on orthodox *Miranda* analysis, which focuses upon the question whether the right against self-incrimination, as guaranteed by the fifth and fourteenth amendments to the United States Constitution and article I, section 10 of the Hawai'i Constitution, has been adequately protected in the course of obtaining a defendant's statement in the context of custodial interrogation. Put differently, if a defen-

dant's *Miranda* rights against self-incrimination have been violated, then any resulting statement will be inadmissible at trial as a *per se* matter, obviating the need for any *Bowesque* due process inquiry into whether the defendant's confession has been coerced, either by a private individual, as in *Bowe,* or as a result of "any impermissible scheme on the part of the police to lower [the defendant's] resistance or render him [or her] susceptible to improper suggestion," *see Kelekolio,* 74 Haw. at 504, 849 P.2d at 70. Correlatively, having been properly *Mirandized,* if a defendant who is subjected to custodial interrogation makes a statement, then, depending on the circumstances, an inquiry into whether the defendant's right to due process of law has been violated via coercion, as in *Bowe* and *Kelekolio,* may be warranted.

Baldly stated, *Bowe* presupposes that a defendant has been subjected to custodial interrogation in compliance with the dictates of *Miranda* and its progeny. It is uncontroverted that, at the time Naititi made the statements that are at issue in the present matter, he was in police custody. The potentially dispositive question thus becomes whether Naititi's statements were the product of "interrogation" as envisioned by *Miranda.* We hold that they were not, but, rather, were "volunteered confessions or admissions, obtained independent of express police questioning or its functional equivalent[.]" *See Ikaika,* 67 Haw. at 566, 698 P.2d at 284.

Obviously hoping to interrogate Naititi, and in the presence of a prearranged and "impeccably credentialed" ASL interpreter, Detective Lavarias asked Naititi whether he wished to make a statement and be afforded the assistance of an attorney. By no stretch of the imagination could these preliminary "yes-or-no" questions be construed as the type that Detective Lavarias "should have known ... were reasonably likely to elicit an incriminating response" from Naititi. *See Ketchum,* 97 Hawai'i at 121, 34 P.3d at 1020; *Ikaika,* 67 Haw. at 567, 698 P.2d at 284. When Naititi's answers were non-responsive, Detective Lavarias immediately ceased further questioning and terminated the inter-

view, thereby never reaching the point at which custodial interrogation, necessitating *Miranda* warnings, commenced. Accordingly, we hold that the circuit court's COL No. 3—that, "[a]s a matter of law, [Naititi], whom the police had already identified as a suspect, was entitled to be informed of his [*Miranda*] rights before Detective Lavarias asked the preliminary question of whether he wanted to make a statement"—was wrong. By the same token, we hold that the circuit court's COL No. 5—that Naititi's "statements to Detective Lavarias could not have been voluntarily made because [Naititi] could not understand the questions posed to him, as interpreted by Prickett"—was wrong as well. If Naititi "could not understand the questions posed to him," then he could not have intended his statements to be responsive to them. By the circuit court's logic, a deaf, mute, and illiterate defendant could *never* communicate a voluntary confession in the wake of even a single question posed to him by the police. On the record before us, we simply cannot agree that Naititi's statements were involuntarily coerced. Rather, as we have held, they were volunteered and not the product of "interrogation." Having done so, we hold that Naititi's constitutional rights against self-incrimination and to due process of law were not violated.

## IV. CONCLUSION

In light of the foregoing analysis, we vacate the circuit court's findings of fact, conclusions of law, and order determining that Naititi's statements to Detective Lavarias were involuntary, filed on April 29, 2003, and remand this case to the circuit court for further proceedings consistent with this opinion.

Concurring and Dissenting Opinion by ACOBA, J.

While I agree that we have jurisdiction herein, I respectfully disagree that the right to *Miranda* warnings of Defendant–Appellant Samuel Naititi (Defendant) was not violated, for the present case involves the classic situation of a police interrogation as envisioned by the *Miranda* decision. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16

L.Ed.2d 694 (1966). When Detective Lavarias (Lavarias) asked whether Defendant "wanted to make a statement," this constituted "express questioning" within the definition of an interrogation as described by the Supreme Court. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see infra* at 238–239, 87 P.3d at 907–908. Accordingly, Defendant was entitled to a warning regarding his Fifth Amendment privileges to remain silent, to have counsel present, and to advise him "of the consequences of forgoing" such rights. *Miranda*, 384 U.S. at 468, 86 S.Ct. 1602; *see infra* at 239, 87 P.3d at 908.

### I.

In *Miranda*, the Supreme Court explained that "there can be no doubt that the Fifth Amendment privilege is available ... to protect persons in all settings in which their freedom is curtailed in any significant way from being compelled to testify. 384 U.S. at 467, 86 S.Ct. 1602. The Court reasoned that "[a]t the outset, if a person in custody is to be subjected to interrogation," he or she must first be warned of his or her Fifth Amendment rights. *Id.* at 467–68, 86 S.Ct. 1602. The warning, now embedded in our national culture, *see Dickerson v. United States*, 530 U.S. 428, 430, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), requires that, prior to an interrogation, a person in custody must be warned, *inter alia*, "of the right to remain silent" and this warning "must be accompanied by the explanation that anything said may be used against the individual in court." *Miranda*, 384 U.S. at 469, 86 S.Ct. 1602. The Fifth Amendment privilege comprehends not only one's right to remain silent, but also the "right to consult with counsel prior to questioning" and the right "to have counsel present during any questioning if the defendant so desires." *Id.* at 470, 86 S.Ct. 1602. The right to have an attorney present prior to being questioned is one of the "indispensable ... protection[s] of the Fifth Amendment[,]" which was established to "mitigate the dangers of untrustworthiness" often present during interrogations. *Id.*

The Supreme Court directed that "the *Miranda* safeguards come into play whenever a

person in custody" is interrogated. *Innis,* 446 U.S. at 301, 100 S.Ct. 1682. The term "interrogation" under *Miranda* refers to the point at which such a suspect is "subjected to either express questioning or its functional equivalent." *Id.* "Functional equivalent" refers to "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police officer should know are reasonably likely to elicit an incriminating response from the suspect." *Id.; see State v. Ikaika,* 67 Haw. 563, 567, 698 P.2d 281, 284 (1985).

## II.

It is undisputed that Defendant was in custody. As the facts indicate, plainly he was subject to express questioning. Detective Lavarias was assigned to investigate allegations of sexual assault. Based on an interview with the complainant, Defendant was named as a suspect. As a result, Defendant was arrested on June 4, 2002, and taken to the main police station cellblock. The next day, Lavarias "went downstairs to the cellblock to get [Defendant]." Because Defendant was deaf and mute, Lavarias had arranged for a sign language interpreter, Hugh Prickett (Prickett), to be present. Lavarias "brought [Defendant] upstairs" from his jail cell, and with Prickett present to interpret, sat Defendant down "in the [Criminal Investigation Division (CID)] interview room." The dimensions of the CID room, occupied by the three men, was only eight feet by eight feet.

In such a setting *Miranda* envisioned that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains *inherently* compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda,* 384 U.S. at 467, 86 S.Ct. 1602 (emphasis added). Thus the Miranda "warning is an *absolute prerequisite* in overcoming the inherent pressures of the interrogation atmosphere." *Id.* at 468, 86 S.Ct. 1602 (emphasis added).

The very first statement of Lavarias was the express question posed to Defendant of whether "he wanted to make a statement today." Lavarias did not inform Defendant of his right to remain silent prior to this question. Lavarias testified that Defendant responded, "I'm sorry. I'm sorry." According to Lavarias, at that time he "stopped ... and asked Mr. Prickett to ask [Defendant] if he wanted an attorney." Lavarias testified that in response to this question, Defendant made some ambiguous yet potentially incriminating statements which the prosecution now seeks to admit as evidence against him.

## III.

It is questionable what legitimate purpose Lavarias' first question would serve. Under *Miranda's* precepts, Defendant could not be expected to make an informed decision on whether or not to make a statement without first having been advised of his right to remain silent, the consequences of forgoing that right, and his right to counsel. "For those unaware of the privilege, the warning is needed simply to make them aware of it[.]" *Id.* at 468, 86 S.Ct. 1602. As the Supreme Court has said,

> this *warning is needed in order to make [a suspect] aware not only of the privilege, but also of the consequences* of forgoing it. It is only through an awareness of these consequences that there can be any real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to *make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.*

*Id.* at 468, 86 S.Ct. 1602 (emphases added). To ask whether an accused wants to give a statement before advising the accused of the legal effect of doing so defeats the purpose of the *Miranda* warning itself. Thus, prior to asking if Defendant wanted to make a statement, Lavarias was obligated to warn him of his "right to remain silent" and that "anything said [could] and [would] be used against" him in court and that he could consult with an attorney before making a statement. *Id.*

## IV.

As indicated, Lavarias' question as to whether Defendant wanted to make a statement was an express question and plainly fell within the purview of *Miranda* for purposes of the constitutionally mandated advisory. *See Innis,* 446 U.S. at 301, 100 S.Ct. 1682. If it were necessary to apply the second prong of the interrogation definition, such a question would obviously constitute the "functional equivalent" of express police questioning. Asking Defendant if he "want[ed] to make a statement" is similar to asking if "he had anything to say," or if "he wanted to tell his side of the story," or if "he had anything he wanted to clear up." While each of these types of questions could be answered with a simple "yes" or "no," it is reasonably foreseeable that a person would respond narratively.

Lay persons are not coached in the legal niceties of limiting responses to the specific inquiry and no more. Normal conversation is not so stilted. Thus it is reasonable, and not difficult to imagine, that if someone is asked whether he or she "want[s] to make a statement" under the coercive atmosphere of police station custody, that he or she would foreseeably answer with something more than a mere "yes" or "no" answer unless properly advised. In light of the circumstances, Lavarias should have known that his words or actions were "reasonably likely to elicit an incriminating response" from Defendant. *Id.*

## V.

Defendant's statements followed upon Lavarias' invitation to make a statement. As such, it cannot be said that Defendant's statements were "communicated spontaneously" or "volunteered" "*independent[ly]*" from such questioning.[1] Majority opinion at 227, 237–238, 87 P.3d at 896, 906–907. Defendant's response was in the context of Lavarias' inquiry about giving a statement. The communication therefore was not "spontaneous" inasmuch as it took place within the context of the interrogation. Nor were the statements volunteered independently from such questioning inasmuch as the statements were not separate from the interrogation process but part of it. Any dispute as to when such statements were made, *see* majority opinion at 239 n. 4, 87 P.3d at 898 n. 4, countenance against the conclusion that such statements fall outside the *Miranda* rule; rather, the record evidences the reason why *Miranda* warnings, as indicated by the Supreme Court, are mandated *before* questioning.[2]

---

1. The majority points to *State v. Ikaika,* 67 Haw. 563, 567, 698 P.2d 281, 284 (1985), and *State v. Ketchum,* 97 Hawai'i 107, 119, 34 P.3d 1006, 1018 (2001), for its conclusion that Defendant was not subject to interrogation, but instead volunteered his statements. Majority opinion at 234–235, 236–238, 87 P.3d at 903–904, 905–907. In *Ikaika,* the suspect, "after being advised of his *Miranda* rights" two times, was asked by a lieutenant "something to the effect of 'What's happening? Must be heavy stuff for two detective to bring you down here." *Ikaika,* 67 Haw. at 565, 698 P.2d at 283. Subsequently the suspect confessed to murder. *See id.* The lieutenant's remarks "were intended merely as a greeting." *Id.* at 567, 698 P.2d at 284. The *Ikaika* court noted that the lieutenant "did not initiate any questioning until [the d]efendant approached him." *Id.*

In the present case, however, the questions were initiated by the detective while Defendant was in custody. As discussed, the statements followed after Lavarias initially asked whether Defendant wanted to make a statement. Accordingly, the present case does not involve a scenario similar to *Ikaika.*

In *Ketchum,* the suspect involved was under arrest and therefore in custody, but the issue revolved around whether "field booking procedures" such as "straight-forward, non-accusatory" questions regarding one's name and address constituted an interrogation. 97 Hawai'i at 128, 34 P.3d at 1027. A majority of this court concluded that the officer "was fully aware that Ketchum's address was relevant to prosecuting him, specifically with regard to establishing that he constructively possessed the drug contraband discovered" at the scene. *Id.* Accordingly the majority concluded that the officer "interrogated" the suspect, for the officer should have known that his words were reasonably likely to elicit an incriminating response. *Id.* Similar to the facts in *Ketchum,* in the present case, Lavarias should have known his question was "reasonably likely to elicit an incriminating response" inasmuch as Defendant was in custody and subject to express questioning. *Id.* at 119–20, 34 P.3d at 1018–19. Thus, factually, *Ketchum* does not apply to a situation involving spontaneous or volunteered statements.

2. Prickett testified that Lavarias "said something about we want to ask you a few questions ... and something about ... the right to have a lawyer or something." Pricket recounted that he didn't "know exactly what was said[,]" but that

## VI.

For the reasons stated above, I would affirm the circuit court's conclusions of law that (1) "[a]s a matter of law, [Defendant] ... was entitled to be informed of his constitutional rights before Detective Lavarias asked the preliminary question of whether he wanted to make a statement" and, (2) "[b]ecause [Defendant] was not informed of his constitutional rights, and therefore did not waive them, [Defendant's] statements to Detective Lavarias in response to the question of whether he wanted an attorney were not voluntarily made and cannot be used at trial" as set forth in the court's April 29, 2003 order.

he was interpreting and Defendant "continued to talk as if he was just not responding to what was—what the detective was saying to him." Thus it appears from Prickett's testimony that Lavarias may have asked both questions prior to Defendant's statement. A discrepancy, then, in the testimonies exists regarding what questions were specifically asked, and what questions Defendant was responding to.

But what cannot be controverted is that Lavarias initiated express questioning. The record thus supports the suppression of Defendant's statements, for the failure to give the *Miranda* warnings engendered confusion that the warnings, if given as required, would have obviated.