STATE OF HAWAII, Plaintiff-Appellee, *v.* ELDRED IKAIKA, Defendant-Appellant.

NO. 8713

(CRIMINAL NO. 6707)

MARCH 22, 1985

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI AND WAKATSUKI, JJ.

## OPINION OF THE COURT BY LUM, C.J.

This is an appeal from a jury conviction of murder in violation of Hawaii Revised Statutes (HRS) § 707-701. Defendant-Appellant Eldred Ikaika contests the denial of his pretrial motion to suppress inculpatory statements made by him while he was in police custody. For the reasons set out below, we affirm the ruling of the trial court.

### I.

Numerous issues are raised on appeal. We choose to discuss only the issue of whether Defendant's inculpatory statements made after assertion of his right to counsel were coerced and involuntary. All other issues are dismissed as being without merit.

### II.

For a recitation of the essential facts we rely upon the trial court's findings which we do not find to be clearly erroneous. *State v. Pestana,* 59 Haw. 375, 581 P.2d 758 (1978).

On May 18, 1979, Melvin Sims was shot and killed while walking along Panaewa Highway in South Hilo, County and State of Hawaii. One year later police received information leading them to believe that James Aki Smith had committed the offense and that Defendant Ikaika had witnessed the murder. The police contacted Defendant.

On May 21, 1981, the Defendant voluntarily came to the Hilo Police Station for an interview which commenced at 11:25 a.m. He denied any knowledge of the crime and voluntarily agreed to take a polygraph. Before taking the examination, the law of hindering prosecution was explained to him. At 12:25 p.m. the Defendant executed a waiver after being advised of his *Miranda* rights by Sergeant Gilbert Flores. Shortly thereafter, he also executed a permission and waiver form reciting that his agreement to take the test was uncoerced and that he understood his constitutional right to silence. The Defendant then took the examination which was found to be deceptive. He was told the polygraph results and that he was going to be held for further questioning.

At 1:55 p.m., the Defendant was again given his *Miranda* warnings by Sergeant Gilbert Tomas; however, defendant executed an advice of rights form in which he indicated that he wanted an attorney present during any interrogation. All questioning then ceased. Sergeant Tomas specifically told the Defendant that he would not be interviewed any further. The Defendant was then taken to the processing area for booking. No immediate efforts were made to secure defense counsel.

Lieutenant Richard Bartolome was the desk officer at the processing room, assisting in fingerprinting suspects. Although Bartolome was acquainted with the Defendant, neither the facts of the case nor the charge against the Defendant were discussed with him by the other detectives.

At approximately 2:15 p.m., Lieutenant Bartolome entered the processing room. He was alone with the Defendant for about three minutes. While Bartolome was preparing the fingerprinting materials, the Defendant stepped to Bartolome's side. Lieutenant Bartolome then told the Defendant something to the effect of, "What's happening? Must be heavy stuff for two detectives to bring you down here?" Bartolome described this comment as a pleasantry or greeting intended to make the Defendant comfortable. The Defendant responded that he had been picked up for questioning about the murder. Without further comment by Bartolome, the Defendant stated, "Bartolome, I cannot lie to you, you've done a lot for me and you have been too nice to me. I shot the haole." The Defendant told Bartolome that he did not want a lawyer and that he would tell the whole story to the police. No promises or threats were made by Bartolome. Bartolome then informed Sergeants Tomas and John Kalawe of Defendant's confession.

Sergeant Tomas informed the Defendant that he could have his attorney present but the Defendant said he did not need one and that he wanted to make a statement.

At 2:35 p.m., the Defendant was readvised of his rights and waived them. He made an oral confession at 3:55 p.m. During the course of his statement, he was again advised of his rights and declined any further explanation of them. He then signed his transcribed statement in which he stated that he had voluntarily changed his mind about having an attorney present.

## III.

It is well recognized that before the State may use statements stemming from custodial interrogation, it must first demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination.[1] *Miranda v. Arizona,* 384 U.S. 436, 467 (1966); *in accord: State v. Paahana,* 66 Haw. 500, 502, 666 P.2d 592, 595 (1983); *State v. Melemai,* 64 Haw. 479, 643 P.2d 541 (1982); *State v. Amorin,* 61 Haw. 356, 604 P.2d 45 (1979); *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971). However, volunteered confessions or admissions, obtained independent of express police questioning or its functional equivalent, are admissible. *State v. Paahana, supra* at 502; *State v. Amorin, supra* at 360, *State v. Patterson,* 59 Haw. 357, 581 P.2d 752 (1978); *State v. Pahio,* 58 Haw. 323, 568 P.2d 1200 (1977).

Here, the Defendant, after receiving *Miranda* warnings, expressed a desire to deal with the authorities only through counsel but later voluntarily confessed to a police officer. The exception to the rule of *Miranda* for statements made outside the custodial interrogation context patently applies even in this highly protected situation. In *Edwards v. Arizona,* 451 U.S. 477 (1981), the United States Supreme Court was asked to decide whether a suspect who requested the presence of an attorney during interrogation waived that right when he later submitted to interrogation at the request of police and implicated himself in a crime. The court held that an accused asserting his right to counsel is not subject to further police interrogation until counsel has been provided, "unless the accused himself initiates further communication, exchanges, or conversations with the authorities." *Id.* at 484, 485. The court stated:

> The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver.

---

[1] A defendant must be advised "of his right to remain silent, that anything he says can and will be used against him, that he has the right to have an attorney present, and that if he cannot afford counsel, one will be appointed for him prior to any interrogation." *State v. Kalai,* 56 Haw. 366, 368, 537 P.2d 8, 11 (1975).

451 U.S. at 485, 486.

As it is undisputed that the Defendant in the instant case was in-custody at the time his incriminating statements were made, our inquiry will focus on whether he was subject to interrogation.[2] The test is whether the police officer should have known that his words or actions were reasonably likely to elicit an incriminating response from the Defendant. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), *State v. Paahana, supra* at 503. From our review of the entire record including the trial court's written findings and conclusions, we cannot conclude that the defendant's inculpatory statements were the product of interrogation.

Lieutenant Bartolome was unaware of the circumstances of the Defendant's detention and did not initiate any questioning until Defendant approached him. His resulting remarks were intended merely as a greeting. Bartolome asked no further questions and made no other remarks. Moreover, the Defendant had had previous encounters with law enforcement. He had been arrested, booked and processed for prior offenses and had been advised of his constitutional rights at least twice before. The Defendant had been jailed on an unrelated misdemeanor in April 1981. At that time, he was advised of his *Miranda* rights by his attorney who specifically informed him that "loose lips sink ships" referring to the inadvisability of speaking to police without an attorney present.

Under these facts, we are unable to conclude that Lieutenant Bartolome could have or should have reasonably foreseen that his words or actions would elicit an incriminating response from the Defendant. At most, Bartolome could have expected that the Defendant respond to his pleasantry by informing him of the reasons for the Defendant's being booked and the case he was involved in. The Defendant's confession was of the nature of an unsolicited, spontaneous statement made in the absence of any police questioning.

Neither are we persuaded that the combined conduct of the

---

[2] In determining whether Defendant's statements were made in a custodial context, the totality of the circumstance must be considered, including the time, place and length of interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors. *State v. Melemai*, 64 Haw. 479, 481, 643 P.2d 541, 544 (1982).

police officers reveals a pattern of coercion sufficient to constitute interrogation.

Accordingly, the Defendant's constitutional rights under both the United States and Hawaii State Constitutions as articulated by *Miranda* and *Edwards* were not violated and his confession properly admitted by the trial court.

Affirmed.

*Joseph P. Florendo, Jr. (Gerald D. Lee Loy* on the opening brief), Deputy Public Defenders, for defendant-appellant.

*Charlene Y. Iboshi,* Deputy Prosecuting Attorney, for plaintiff-appellee.

DISSENTING OPINION OF PADGETT, J.

I respectfully dissent. We are here dealing with a heinous crime but we are also dealing with an asserted constitutional right and are bound by the decisions on the subject by the United States Supreme Court. Despite the revulsion I feel with respect to the crime in question, and, equally, with respect to the result that suppressing appellant's confessions might lead to, I cannot join in the affirmance.

It seems clear to me that the Supreme Court has said that once an accused has asked for counsel, interrogation (other than routine matters such as requests for name and address) must cease unless the accused himself initiates further contact. That is not what happened here, and, in my view, appellant's rights under the Fifth and Sixth Amendments to the Constitution of the United States were violated.

The facts of this case lie squarely within the rule announced by the United States Supreme Court in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).[1]

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to

---

[1] Compare the facts set forth in the recent case of *Shea v. Louisiana,* ____ U.S. ____, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985), where all parties conceded that *Edwards* had been violated.

further *police-initiated* custodial interrogation even if he has been advised of his rights. . . .

*Id.* at 484, 101 S.Ct. at 1884-85, 68 L.Ed.2d at 386 (emphasis added) (footnote omitted).

It is uncontested on appeal that appellant was initially suspected of being a witness to the murder under investigation; that appellant was confronted with the testimonial evidence linking him to the incident; that upon his denial of any involvement, appellant was informed that he could be charged with "hindering prosecution"; that appellant was told that he had "flunked" the polygraph examination; that appellant challenged the accuracy of the examination and asserted his right to the presence of counsel during any further questioning; and that appellant was then informed that he would be held for further questioning and that he could be held for 48 hours without charges and without bail.

It is also uncontested that appellant was taken to another room to be "booked"; that the booking officer was Lt. Bartolome, who knew appellant personally, both as a police counselor and later casually; and that Bartolome was alone in the processing room with appellant when he asked appellant the question: "What's happening, Eldred? It must be pretty heavy for two detectives to be bringing you down to be processed." In response, appellant began explaining why he was being held for questioning, then broke down crying and saying, "Bartolome, I cannot lie to you. You have been too nice to me in the past and you've always helped me out. You did a lot for me, and I cannot lie to you. I shot the haole." At trial, Bartolome testified on cross-examination that he (Bartolome) must have said "something" else before appellant further stated that he would tell Bartolome the whole story and that he did not need a lawyer present.

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court held that custodial interrogation of a putative defendant must be preceded by advice to the accused of his right to remain silent and his right to the presence of an attorney. The court outlined the now famous *Miranda* warnings as well as procedures to be followed subsequent to giving those warnings: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74, 86 S.Ct. at 1627, 16 L.Ed. at 723 (footnote

omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 723.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the court made it clear that "custodial interrogation" under *Miranda* is not so narrowly defined as to be limited to express questioning of a defendant while in custody.

> The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. . . .

*Id.* at 299, 100 S.Ct. at 1688, 64 L.Ed.2d at 306, quoting *Miranda, supra,* 384 U.S. at 457-58, 86 S.Ct. 1617, 16 L.Ed.2d at 694.

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. . . .

*Id.* at 300-01, 100 S.Ct. at 1689-90, 64 L.Ed.2d at 307-08 (footnotes omitted).

The court in *Innis* held that the defendant, although in custody, had not been "interrogated" as a result of a conversation between two police officers held in the defendant's presence. The court first noted that the "first prong" of the definition of interrogation had not been satisfied, because there had been no express questioning of the defendant. *Id.* at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 308. Nor had the defendant been subjected to the "functional equiva-

lent"of questioning, because the conversation between the police officers did not amount to "words or actions that the police should have known were reasonably likely to elicit an incriminating response . . . ." *Id.* at 303, 100 S.Ct. at 1691, 64 L.Ed.2d at 309.

The instant case is easily distinguishable from the result reached in *Innis, supra.* Here, Officer Bartolome (1) initiated a conversation, (2) with appellant, (3) beyond the indifferent necessities of the booking process, (4) by asking the direct question: "What's happening, Eldred? It must be pretty heavy for two detectives to be bringing you down to be processed." It cannot reasonably be maintained that this statement was not intended to draw some response from appellant. Nor can it be gainsaid that the question clearly related to the subject of appellant's arrest and the reasons therefor. Thus, the trial court's finding that the officer's remarks were merely part of an exchange of pleasantries was, in my view, clearly erroneous.

From the record in this case I can only conclude that appellant was impermissibly solicited to enter a conversation on the subject of his incarceration within minutes of his formal, written assertion of his right to remain silent absent the presence of counsel and before such counsel had been provided. "[I]t is inconsistent with *Miranda* and its progeny for the authorities, *at their instance,* to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards, supra,* 451 U.S. at 485, 101 S.Ct. at 1885, 68 L.Ed.2d at 387 (emphasis added).

Even if it is assumed that our analysis should reach the "second prong" of the test for custodial interrogation it is patently clear from the facts adduced by the lower court that Officer Bartolome either knew or should have known that his question was likely to invite an incriminating response from appellant. Bartolome had counselled appellant "one-to-one" when appellant was in intermediate school and Bartolome was a police liaison officer assigned to that school. Bartolome testified at the suppression hearing that he and appellant exchanged greetings as acquaintances during the years following appellant's term in school, and that Bartolome had known appellant off and on for approximately 10 years. Finally, the testimony of Bartolome as well as the other police officers indicates that Bartolome regularly addressed or referred to appellant by his first name or by the nickname "Ika."

The court in *Innis* found "nothing in the record to suggest that the officers were aware that the respondent was peculiarly suscepible to an appeal to his conscience . . . ." 446 U.S. at 302, 100 S.Ct. at 1690, 64 L.Ed.2d at 309. In the instant case, the familiarity of appellant and Bartolome, based on a prior confidential relationship, is of itself sufficient to show that Bartolome should have known that appellant would likely respond to his overture by offering incriminating statements. Nor is it reasonable to assume that Lt. Bartolome, an officer of 13 years of experience, lacked this knowledge simply because he may not have known at the time whether appellant had been informed of and asserted his constitutional rights. By his own statement to appellant in the processing room, Bartolome was aware that appellant was being held for something "pretty heavy."

The parties agree that appellant effectively asserted his right to be free of questioning absent the presence of counsel. It is uncontested that appellant did not initiate the exchange with Bartolome which led to appellant's inculpatory statements. It is also clear from the record that counsel was not made available to appellant during the brief interim between his assertion of his constitutional rights and the question posed by Bartolome. On these three facts alone, it is clear that appellant was impermissibly subjected to custodial interrogation at the instance of the government and contrary to the letter and to the principles enunciated in *Edwards*. Appellant's statements to Bartolome were not made pursuant to a valid waiver and therefore were inadmissible. I would hold that the trial court erred in failing to suppress appellant's statements to Bartolome and the tainted evidence subsequently obtained thereby. The judgment of conviction should be vacated and the order denying suppression reversed.