Electronically Filed
Intermediate Court of Appeals
CAAP-12-0001011
29-AUG-2014
03:53 PM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
GREGORY A. KAZANAS, Defendant-Appellant


NO. CAAP-12-0001011


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-1592)

AUGUST 29, 2014

NAKAMURA, C.J., AND FUJISE, J., WITH FOLEY, J., DISSENTING

OPINION OF THE COURT BY NAKAMURA, C.J.

The use of a criminal defendant's voluntary statements and admissions as evidence at trial is a critical component of our criminal justice system. Voluntary statements and admissions are reliable. They provide key evidence necessary to solve crimes and facilitate our search for the truth. They provide assurance to the public that the culprit had been brought to justice and promote faith and confidence in our judicial system.

"Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law[.]" Maryland v. Shatzer, 559 U.S. 98, 108 (2010) (internal quotation marks and citations omitted).

The Fifth Amendment protects a person from being "compelled in any criminal case to be a witness against himself," and, in the context of a criminal investigation, prevents the police from forcing or coercing a suspect into making an incriminating statement. The requirements imposed by Miranda v. Arizona, 384 U.S. 436 (1966), were designed to safeguard a defendant's privilege against compulsory self-incrimination. See Rhode Island v. Innis, 446 U.S. 291, 297 (1980).

In Miranda, the Court cited a variety of police interrogation techniques which involved psychological coercion that were being used to extract incriminating statements from suspects in custody. Miranda, 384 U.S. at 448-58. "The concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Innis, 446 U.S. at 299 (citation omitted). Therefore, the Court required that a suspect in custody receive a specified advice of rights, the Miranda warnings, before being subjected to custodial interrogation. Miranda, 384 U.S. at 478-79. In determining whether a suspect in custody has been subjected to "interrogation" for purposes of Miranda, and thus entitled to Miranda warnings, "the ultimate question becomes 'whether the police officer should have known that his or her words or actions were reasonably likely to elicit an incriminating response[.]'" State v. Ketchum, 97 Hawai'i 107, 119, 34 P.3d 1006, 1018 (2001) (quoting State v. Ikaika, 67 Haw. 563, 567, 698 P.2d 281, 284 (1985).

In this case, Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Gregory A. Kazanas (Kazanas) with first-degree unauthorized entry into a motor vehicle (UEMV) for allegedly grabbing and repeatedly punching the driver through the driver's side window. Kazanas's defense at trial was mistaken identity -- that he was not the person who had committed

the alleged acts. However, after his arrest, Kazanas made an incriminating statement to Officer Cristy-Lynn Avilla (Officer Avilla), who had been assigned to take Kazanas to the hospital.

Prior to taking Kazanas to the hospital, Officer Avilla told Kazanas that he "was not allowed to talk about the case or say anything about what he had been arrested for," but she did not give Kazanas Miranda warnings. While at the hospital, in an attempt to calm Kazanas, who was making rude comments to others at the hospital, Officer Avilla made "small talk" with Kazanas by asking if he enjoyed Halloween that night and what kind of costumes he saw. A period of time passed. Kazanas then stated that "If people didn't upset me, I wouldn't have to punch them."

On appeal, Kazanas contends that the trial court[1] erred in permitting Kazanas's statement to be introduced into evidence at trial, because he claims the statement was the product of a custodial interrogation. We conclude that Officer Avilla did not subject Kazanas to "interrogation" for purposes of Miranda and that Kazanas's statement was not in response to "interrogation" by the Officer. Therefore, the absence of prior Miranda warnings by Officer Avilla did not provide a basis to suppress Kazanas's spontaneous and volunteered statement. Under the circumstances presented, we hold that the trial court properly permitted the State to introduce Kazanas's statement at trial.

Kazanas also contends that the trial court erred in permitting evidence of prior incidents involving Kazanas, which the State offered to rebut Kazanas's claim that his physical disabilities rendered him incapable of engaging in the conduct described by the complaining witness. We hold that the trial court did not err in permitting the State to introduce prior incidents involving Kazanas that were relevant to his physical capabilities, after Kazanas opened the door to such evidence.

---

[1] The Honorable Rom A. Trader presided.

BACKGROUND

I. Trial Evidence

A.

The following evidence was adduced in the State's case-in-chief at trial. Shortly after midnight, in the early morning of November 1, 2011, the complaining witness (CW) was driving a 1990 White Mazda Protege through Waikīkī. The CW, who was 65, had gone with three friends to Waikīkī to observe the Halloween festivities. The CW had just dropped off two of his friends, including the owner of the car, to get food, while the third friend, an elderly woman, remained in the backseat. The CW planned to pick up his two friends after they purchased the food.

While driving down Kūhiō Avenue, the CW encountered a group of people running across the street and stopped to let them pass. The CW testified that he drove forward slowly after the group had passed. However, as he entered the intersection, a straggler, "[o]ut of the blue," darted across the street, "ran headlong" into the CW's vehicle, tumbled, bounced up, and continued running. Another group of people, apparently believing that the CW had hit this person, converged on the CW's car, shouting, pounding on the windows, and rocking the car. The CW heard the back window crack next to where his friend was sitting.

The CW testified that he saw a man on the hood of the CW's car with heavy boots stomping against the windshield. The man hopped down from the hood and moved to the driver's side of the car. The man then reached in through the open window, grabbed the CW around the neck, and punched the CW several times in the face with a closed right hand. The man spoke to the CW in an "[a]ngry, inebriated, and just pretty vehement" tone, and the CW could smell alcohol on the man's breath. The CW had a clear and unobstructed view of the man from the chest up.

Around 12:30 a.m., James Easley (Easley), a former police officer for the Honolulu Police Department (HPD), witnessed an incident as Easely stood on Kūhiō Avenue in a "sad

4

clown" costume. Easley testified he saw a man, whom he recognized as Kazanas, dressed as a knight, wearing a metal mesh shirt. Easley saw Kazanas break the back window of the CW's car, run to the front of the car, jump on the hood, "kind of rolling on over," approach the driver's window, and repeatedly punch the driver through the open window. Another man, who appeared to be a friend of Kazanas, then grabbed Kazanas and pulled him away from the vehicle, and Kazanas eventually walked away from the scene.

Easley explained that he knew and recognized Kazanas from a prior incident, several years earlier, in which Easley had responded as a police officer to a report that a man had jumped from the ninth floor balcony of the Aloha Surf Hotel. Kazanas was the man who had jumped or fallen from the ninth floor. Easley testified that he would never forget Kazanas or his name because Kazanas had survived the fall, having landed on a beach chair on the pool deck, and was coherent when Easley arrived.

Easley was within twenty feet of Kazanas when Easley first saw Kazanas break the back window of the CW's car. Easley then moved closer and eventually got to within about two feet of Kazanas when the man who appeared to be Kazanas's friend pulled Kazanas away from the car. Easley testified that he had a clear and unobstructed view of Kazanas from the time Kazanas broke the back window through when Kazanas was punching the driver.

The CW drove away from the scene and found police officers. The CW reported the incident and gave the police a description of his assailant.

In the meantime, Easley, after walking away from the scene, saw the police next to the CW's car. Easley informed one of the police officers that he had observed the incident and knew who the suspect was. As Easley continued walking through Waikīkī, he spotted Kazanas, notified the police, and watched Kazanas until the police detained Kazanas.

The police drove the CW to the area where Kazanas was being detained, and the CW identified Kazanas as the person who had assaulted him. The CW made this identification within an hour after the incident. The CW also identified Kazanas in court as the man who had punched him. The CW suffered injuries, consisting of a bleeding left ear and interior cuts to the cheek and gum area.

After the CW identified Kazanas, the police arrested Kazanas, and Kazanas was taken to a hospital by HPD Officer Christy-Lynn Avilla. Officer Avilla testified that she observed injuries to Kazanas's right hand area that "appeared to be cuts and fresh cuts." The State also introduced photographs taken of Kazanas's right hand, which Officer Avilla described as showing redness on the top of Kazanas's knuckles and minor scrapes around it. At the hospital, Kazanas stated, "If people didn't upset me, I wouldn't have to punch them."

B.

In the defense case, Kazanas called two friends, Simon Farrington (Farrington) and Hans Madrid Kolbisen (Kolbisen), who testified that they had accompanied Kazanas to Waikīkī on the night of the charged incident. Both Farrington and Kolbisen presented testimony that Kazanas was not the person who had assaulted the CW.

According to Farrington, he witnessed an incident in which someone fought with the driver of a car, and Kazanas was not the person who fought with the driver. Farrington described the person who fought with the driver as about "5' 5" or 5' 6", with "darker skin," "maybe Filipino, Hawaiian, or something like that," whereas Farrington described Kazanas as 6' 2" and Caucasian.

According to Kolbisen, he witnessed the incident with the car and observed a dark-skinned teenager, possibly Filipino, about 150 pounds, beating on the car and hassling the driver.

Kazanas was not involved in the incident, but was standing next to Kolbisen, watching the incident from about thirty yards away.

Kazanas testified in his own defense at trial. Kazanas stated that he was about 6' 4" tall and weighted 220 pounds. According to Kazanas, he went with several of his friends to Waikīkī in the evening of October 31, 2011, and they ended up at a club. Kazanas was in costume, dressed as a knight, with a metal chain vest and a plastic sword. At one point, Kazanas left the club to walk to his father's house. However, on the way, he was "drop-kicked to the ground" and hit his head, when he tried to intervene to assist someone that was being attacked by others.

Kazanas acknowledged that, as Easley had testified, Kazanas had previously fallen nine stories from the Aloha Surf Hotel. Kazanas stated that because of the injuries he sustained in the nine-story fall, he could not fully extend his right arm or bend his wrist. Therefore, he had to use his knuckles to push himself off the ground in order to get up after he was kicked to the ground. Kazanas explained that the red marks on the knuckles of his right hand, as shown in the photographs introduced by the State, were caused by his using his knuckles in this fashion.[2] After getting up, Kazanas stated that he shuffled away because he cannot run due to the injuries from the nine-story fall.

Kazanas testified that he rejoined his friends, who told him that someone had been run over by a vehicle. They all proceeded to watch the commotion, which involved a "car being surrounded and people harassing the driver[.]" Kazanas watched with his friends from a distance of about ten to fifteen feet. Kazanas recalled that someone had smashed the back window of the car, but indicated that his recollection of what happened during the remainder of the evening was not good. Kazanas denied

---

[2] Kazanas had earlier called Morris "Keiha" Gomes (Gomes) as a witness. Gomes testified that on October 31, 2011, at about 11:30 p.m., he saw Kazanas get kicked in the chest, fall to the ground, then get up and take off running.

jumping on the hood of the car or reaching into the car and punching the CW with his right hand, as the CW had testified. Kazanas explained that because of injuries he had sustained in the nine-story fall, he was not physically capable of engaging in such actions:

> [Defense Counsel:] Q. Now, the witnesses are saying that you had -- well, [the CW] is saying that the person that hit him jumped on the hood of that white car; you remember that?
>
> [Kazanas:] A. I remember him saying that, yes.
>
> Q. Yes. Now, did you jump on the hood of that car?
>
> A. No, I did not.
>
> Q. Okay. Would you be able to do that?
>
> A. No, I would have to crawl up onto the hood.
>
> Q. Why is that?
>
> A. Because I can't jump.
>
> Q. Why is that, that you can't jump?
>
> A. My legs restrict me to jump. I have about 37 screws and seven rods in my legs from my hips to my feet; it's like I'm wearing a pair of steel-toe boots all the time. I can barely jump an inch or two off the ground.
>
> . . . .
>
> Q. Now, [the CW] is saying that you had reached in the car and punched him with your right hand. Did you do that?
>
> A. No.
>
> Q. Why?
>
> A. I wouldn't have been able to reach into the car.
>
> Q. Okay.
>
> A. I have limited range of motion on my arm, my right arm specifically.
>
> Q. And that being you're not being able to fully extend your arm?
>
> A. Yes.

Kazanas testified that after he was arrested, he asked to go to Queen's Hospital because he had been attacked earlier that evening and wanted to be checked out to make sure he had no

injuries. Kazanas acknowledged that at the hospital, he made the comment to Officer Avilla that "I wouldn't have to punch people if they didn't upset me," and he explained the comment as follows:

> [Defense Counsel:] Q. Okay. Now, Officer Avilla said that something to the effect that you had said "I wouldn't have to punch people if they didn't upset me." You heard her testify about that, right?
>
> [Kazanas:] A. Yes
>
> Q. Okay. Why did you say that?
>
> A. I was under stress.
>
> Q. And what were you talking about?
>
> A. Nothing. I was just speculating to the fact that they said that I was under arrest for an assault.

On cross-examination, the State sought to introduce other incidents involving Kazanas that occurred after his nine-story fall in 2005 to rebut Kazanas's claim that he was physically incapable of engaging in the acts alleged by the CW (and corroborated by Easley). The Circuit Court had previously granted Kazanas's motion in limine to exclude evidence of these prior incidents. The Circuit Court permitted the State to ask about the prior incidents, but limited the State's questioning to matters that related to Kazanas's physical actions in the prior incidents. The Circuit Court precluded the State from adducing evidence that Kazanas had been arrested or convicted with respect to the prior incidents.

Pursuant to the Circuit Court's ruling, the State elicited evidence that: (1) on March 31, 2007, Kazanas ran and jumped over a waist-level fence, and that Kazanas and a male grabbed two other males from behind and punched them in the face; and (2) on April 21, 2006, Kazanas punched a woman in the face, arms, and legs.

9

II. Pretrial Proceedings

A.

The State charged Kazanas by indictment with first-degree criminal property damage (Count 1) and first-degree UEMV (Count 2). On March 21, 2012, Kazanas filed a motion in limine seeking, among other things, to exclude (1) statements made by Kazanas to Officer Avilla at the hospital and (2) evidence of Kazanas's prior criminal record. On May 25, 2012, the State filed its "Notice of Intent to Use Evidence of Prior Acts" (Notice of Intent), in which the State gave notice of its intent to introduce evidence of Kazanas's engaging in assaultive conduct with respect to incidents occurring on April 21, 2006, and March 31, 2007. These incidents occurred after Kazanas's nine-story fall. In the April 21, 2006, incident, Kazanas allegedly "ambushed" and physically assaulted his ex-girlfriend in her apartment and stole several items. In the March 31, 2007, incident, Kazanas and another person allegedly attacked two males from behind, and when the police subsequently located Kazanas, he allegedly fled and jumped over a fence before being apprehended. The State attached police reports and conviction records relating to these incidents.

On May 29, 2012, the State filed a "Motion to Determine the Voluntariness of Defendants' Statements to the Police" (Voluntariness Motion). The State sought, among other things, a finding by the Circuit Court that two statements made by Kazanas to Officer Avilla at the hospital were voluntarily made. The first statement was: "I wouldn't have to punch people if they didn't upset me." The second statement was: "If you didn't catch me now for this, you would've caught me later for something else." In support of its Voluntariness Motion, the State asserted that Kazanas made these statements "without any prompting or questioning by Officer Avilla."

10

B.

The Circuit Court heard the parties' motions on August 6, 2012. Officer Avilla was the sole witness called to testify at the hearing. Officer Avilla testified that she was assigned to transport Kazanas from the place of his arrest to Queen's Hospital. Upon Kazanas's arrest, Officer Avilla informed him that "he was not allowed to talk about the case or say anything about what he had been arrested for." She also told him "multiple times that he was being arrested for UEMV First." Officer Avilla did not give <u>Miranda</u> warnings to Kazanas.

On direct examination, Officer Avilla testified that while at the hospital, Kazanas made two spontaneous statements to her.

> [Deputy Prosecuting Attorney:] Q. As you were in the HPD room -- waiting room, did [Kazanas] say anything to you?
>
> [Officer Avilla:] A. He said that -- he spontaneously uttered, "If people didn't upset me, I wouldn't have to punch them."
>
> Q. Was this statement by [Kazanas] in response to any questions that you asked him?
>
> A. No, ma'am.
>
> Q. Was this a voluntary statement?
>
> A. It was a voluntary statement.
>
> Q. Now, after [Kazanas] made that statement that he wouldn't have to punch people if they didn't upset him, what if anything did you say?
>
> [Defense Counsel]: Your Honor, I have to object as to the characterization as to voluntary.
>
> The COURT: Sustained. That's a determination for the Court to make.
>
> Q. (By [Deputy Prosecuting Attorney]:) So I'm just going re-ask this question. When [Kazanas] made the statement "I wouldn't have to punch people if they didn't upset me," what if anything did you say to [Kazanas]?
>
> A. I immediately told him that it was still -- his case was still under investigation and to stop what he was saying, because it could be used against him in a court of law.
>
> Q. After you made that statement to [Kazanas], did you try to engage him in any conversation?

11

A. No, ma'am.

Q. Did you ask him any questions related to his arrest?

A. No, ma'am.

Q. Did you threaten him in any way?

A. No, ma'am.

Q. Did you physically touch him in any way?

A. No, ma'am.

Q. Did [Kazanas] say anything else to you?

A. He did. Right after he had made that statement and after I told him to not say anything else, he apologized to me and he said that -- I'm sorry.

Q. Would there be anything to help you remember what he said?

A. Yes, if can I see my report, please?

. . . .

Q. What then did [Kazanas] say to you?

A. [Kazanas] said to me, he apologized and said, "If you didn't catch me now, you would have caught me for something else later."

Q. And what did you say in response to that statement?

A. I told him that what I had told him previously still applied.

Q. And what was that that you had previously told him?

A. That anything that he said in regards to the investigation could be used against him and to stop what he was saying.

On cross-examination, Officer Avilla testified that prior to Kazanas making his statements, she had engaged in casual conversation with Kazanas to calm him down by asking questions unrelated to the investigation because he was making rude comments to patients at the hospital.

[Defense Counsel:] Q. Okay. Now, when you say he said to you, "I wouldn't have to punch people if they didn't upset me," but before that you said that you didn't ask him any questions, correct?

[Officer Avilla:]  A.  I did ask him questions along the lines, because when we were in the main area of the hospital Mr. Kazanas was making comments that were rude and other patients could hear it, so that's why we moved to the HPD room or away from the public.  And in response to his comments, I was trying to ask him questions about if he enjoyed Halloween that night, what kind of costumes did he see, but nothing along the lines in reference to the investigation, sir.

Q.  All right.  So when he was rude, he was talking loudly?

A.  Loudly and saying just upsetting things that if the general public were to hear, it would upset them.

. . . .

Q.  So as you were talking to him about enjoying Halloween and the costumes, you never told him if he were to respond, that he has a right to remain silent, correct?

A.  Whenever -- when he had said that spontaneous utterance, I did tell him, and I continuously told him, because he kept asking me why am I here, why am I here, and I told him that he was arrested for UEMV First.

Q.  But while you were talking to him about enjoying Halloween and carrying on a discussion with him --

A.  It wasn't a discussion, sir.

Q.  All right.  So you were asking him about how he enjoyed Halloween?

A.  Right.

Q.  That's a question, correct?

A.  It was to help him calm down and to get his mind off of saying those rude things, sir.

Q.  Okay.  But you don't know what his response would be, right?

A.  No, sir.

Q.  And you were asking about costumes as well?

A.  Yes, sir.

Q.  Okay.  Before you were asking him these questions, did you inform him that he had a right to remain silent?

A.  No, sir.  Well, when I arrested him, I told him that he was not allowed to talk about the case or say anything about what he had been arrested for.

On redirect, Officer Avilla testified that Kazanas's statements were not in response to her "small-talk" questions and came "out of the blue":

> [Deputy Prosecuting Attorney:] Q. The two statements that we're discussing, one being "If people didn't upset me, I wouldn't have to punch them," and the second statement being "If you didn't catch me now for this, you would have caught me for something else," was that in response to one of these small talk questions that you mentioned that you were engaging in with him?
>
> [Officer Avilla:] A. No, ma'am. It wasn't in response to our conversation.
>
> Q. In fact, had there been a period of time that passed between the small talk to try to calm him down and the time he made these statements?
>
> A. Yes, ma'am.
>
> Q. Do you know about how much time passed?
>
> A. I can't recall, but when he did make the statement, I did tell him that he couldn't talk about it. But it wasn't along the lines of what I had asked him, if Halloween was fun and costumes; it was an utterance that was just out of the blue, that was out of context of what we were talking about.

After hearing Officer Avilla's testimony, the Circuit Court orally ruled:

> The two utterances testified by Officer Avilla, the Court will be granting the State's motion for voluntariness in part and denying it in part. The Court will grant the State's Motion for Determination of Voluntariness as to the first statement that was, "I wouldn't have to punch people if they didn't upset me." The Court believes that based upon the circumstances that were adduced during the hearing, that that statement, although [Kazanas] was in custody, clearly was in handcuffs in the custody of an HPD officer at Queen's [Hospital], they were nonetheless, under all the circumstances presented, voluntarily made, and they were not in response to any sort of investigatory questioning by the officer, and so that statement may be used.
>
> As to the second statement, the motion will be denied. And to the extent that even if that statement was nevertheless determined to be voluntary, which the Court believes it would otherwise be, the Court believes that the nature of that statement is such that it is not relevant, it is a comment by the defendant which touches upon his character which clearly at this stage of the proceedings would not be appropriate, and so the Court will deny that aspect of the motion and will exclude that particular evidence.

(Emphasis added.) The Circuit Court subsequently filed its

written "Order Granting in Part and Denying in Part State's Motion to Determine Voluntariness of Defendant's Statements to the Police." The Circuit found in relevant part:

> 1. [Kazanas's] statement to Officer Avilla, "I would't have to punch people if they didn't upset me" was a voluntary statement and is admissible.
>
> 2. [Kazanas's] statement to Officer Avilla, "If you didn't catch me now for this, you would've caught me later for something else" was a voluntary statement. However, the statement is excluded on the basis of unfair prejudice to [Kazanas].

C.

Regarding the evidence of Kazanas's prior acts, the State argued that it was relevant to show that Kazanas was the first-aggressor. Kazanas countered that there was no issue as far as self-defense or first aggressor because the defense at trial would be identification. The Circuit Court ruled that it was granting Kazanas's motion in limine and precluding the prior act evidence. The Circuit Court, however, stated that the State could revisit this ruling if the defense opens the door or things happen at trial that make the prior act evidence relevant.

III. Verdict and Sentence

Based on the evidence presented at trial, the jury found Kazanas not guilty of first-degree criminal property damage, as charged in Count 1, and guilty of first-degree OEMV, as charged in Count 2. The Circuit Court sentenced Kazanas to five years of probation, subject to the special condition that he serve a 90-day term of imprisonment. The Circuit Court entered its Judgment on October 23, 2012.

DISCUSSION

I.

Kazanas contends that the Circuit Court erred in admitting his statement to Officer Avilla that, "If people didn't upset me, I wouldn't have to punch them." Kazanas asserts that this utterance was elicited during a custodial interrogation, and thus, prior <u>Miranda</u> warnings were required. We disagree.

15

A.

The requirements imposed by Miranda, 384 U.S. 436, were designed to safeguard a defendant's privilege against compulsory self-incrimination. See Innis, 446 U.S. at 297. In Miranda, "the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination." Innis, 446 U.S. at 297. The Miranda Court cited a number of police interrogation techniques that used psychological ploys and pressure to obtain statements from suspects in custody. Miranda, 384 U.S. at 448-58. "The concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Innis, 446 U.S. at 299 (citation omitted). Therefore, the Miranda Court required that a suspect in custody receive a specified advice of rights, i.e., Miranda warnings, before being subjected to custodial interrogation. Miranda, 384 U.S. 478-79.

B.

In the instant case, there is no dispute that Kazanas was in custody when he made the challenged statement to Officer Avilla. Thus, the critical question in this case is whether Kazanas was subjected to "interrogation" when he made the statement.

The United States Supreme Court defines "interrogation" for Miranda purposes as referring to "express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301

16

(footnotes omitted). Because the police "cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." Id. at 301-02 (footnote omitted). In Innis, the Supreme Court explained that "'[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Id. at 300.

The Supreme Court also expressly recognized in Miranda that:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

Miranda, 384 U.S. at 478 (emphases added; footnote omitted).

The Hawai'i Constitution's privilege against self-incrimination, set forth in Article I, Section 10, provides an independent source for the protections enumerated in Miranda. Ketchum, 97 Hawai'i at 116, 34 P.3d at 1015. The Hawai'i Supreme Court has essentially adopted the Innis definition of interrogation in applying Miranda under the Article I, Section 10. See id. at 119, 34 P.3d at 1018. In Ketchum, the supreme court stated: "Generally speaking, interrogation, as used in a Miranda context, means express questioning or its functional equivalent[,]" and that "the ultimate question becomes whether the police officer should have known that his or her words or actions were reasonably likely to elicit an incriminating

response from the person in custody." Id. (internal quotation marks, brackets, and citations omitted).

The Hawai'i Supreme Court has held that in determining whether "interrogation" has occurred, a court must consider the "totality of the circumstances . . . with a focus upon the officer's conduct, the nature of the question (including whether the question is a routine booking question), and any other relevant circumstance." Id. at 121, 34 P.3d at 1020 (internal quotation marks and footnotes omitted). In addition, "volunteered confessions or admissions, obtained independent of express police questioning or its functional equivalent, are admissible." Ikaika, 67 Haw. at 566, 698 P.2d at 284; State v. Naititi, 104 Hawai'i 224, 236, 87 P.3d 893, 905 (2004).

C.

In Ikaika, the Hawai'i Supreme Court addressed whether a defendant's inculpatory statements made while in custody and after he requested a lawyer were the product of interrogation. Ikaika, 67 Haw. at 564, 698 P.2d at 282. The Defendant, Eldred Ikaika (Ikaika), was advised of his Miranda rights and he asked for lawyer, at which point all questioning ceased. Id. at 565, 698 P.2d at 283. Lieutenant Richard Bartolome, who was acquainted with Ikaika but not involved in or familiar with the investigation, was responsible for fingerprinting Ikaika as part of Ikaika's booking process. Id. While preparing to fingerprint Ikaika, Lieutenant Bartolome said to Ikaika, "'What's happening? Must be heavy stuff for two detectives to bring you down here?'" Id. Ikaika responded that he had been picked up for questioning about a murder. Id. Without further comment by Lieutenant Bartolome, Ikaika stated: "'Bartolome I cannot lie to you, you've done a lot for me and you have been too nice to me. I shot the haole.'" Id.

The Hawai'i Supreme Court held that under the circumstances of the case, Ikaika had not been subjected to interrogation, and that his confession had been properly

18

admitted. Id. at 567, 698 P.2d at 285. The court stated that "[t]he test [for determining if Ikaika was subject to interrogation] is whether the police officer should have known that his words or actions were reasonably likely to elicit an incriminating response from the Defendant." Id. The court held:

> Lieutenant Bartolome was unaware of the circumstances of the Defendant's detention and did not initiate any questioning until Defendant approached him. His resulting remarks were intended merely as a greeting. Bartolome asked no further questions and made no other remarks. Moreover, the Defendant had had previous encounters with law enforcement. He had been arrested, booked and processed for prior offenses and had been advised of his constitutional rights at least twice before. The Defendant had been jailed on an unrelated misdemeanor in April 1981. At that time, he was advised of his Miranda rights by his attorney who specifically informed him that "loose lips sink ships" referring to the inadvisability of speaking to police without an attorney present.
>
> Under these facts, we are unable to conclude that Lieutenant Bartolome could have or should have reasonably foreseen that his words or actions would elicit an incriminating response from the Defendant. At most, Bartolome could have expected that the Defendant respond to his pleasantry by informing him of the reasons for the Defendant's being booked and the case he was involved in. The Defendant's confession was of the nature of an unsolicited, spontaneous statement made in the absence of any police questioning.
>
> Neither are we persuaded that the combined conduct of the police officers reveals a pattern of coercion sufficient to constitute interrogation.
>
> Accordingly, the Defendant's constitutional rights under both the United States and Hawaii State Constitutions as articulated by Miranda and Edwards were not violated and his confession properly admitted by the trial court.

Id. at 567-68, 698 P.2d at 284-85 (emphasis added).

### D.

We conclude, under the totality of the circumstances, that Kazanas's statement, "If people didn't upset me, I wouldn't have to punch them," was volunteered, unsolicited, and spontaneous, and was not in response to any interrogation by Officer Avilla. Because Kazanas's statement was not the product of interrogation by Officer Avilla, prior Miranda warnings were not required. State v. Paahana, 66 Haw. 499, 503-04, 666 P.2d 592, 596 (1983).

19

The record shows that upon Kazanas's arrest, before he made the incriminating remark, Officer Avilla told him that "he was not allowed to talk about the case or say anything about what he had been arrested for." While at the hospital, in order to calm Kazanas, who was making rude remarks to other patients, Officer Avilla's engaged in "small talk" with Kazanas by asking if he enjoyed Halloween that night and what kind of costumes he saw. There is no suggestion that Officer Avilla's "small talk" was a psychological ploy or tactic to induce Kazanas to make an incriminating statement. It is clear that Officer Avilla was not attempting, and did not intend, to elicit any statement from Kazanas about his case or the investigation. We do not believe that Officer Avilla should have reasonably foreseen, or that she should have known, that her "small talk" questions about enjoying Halloween that night and the kind of costumes Kazanas had seen would elicit Kazanas's non-responsive statement that "If people didn't upset me, I wouldn't have to punch them." As Officer Avilla testified, Kazanas's statement "was just out of the blue."

Similar to Ikaika, Officer Avilla's innocuous questions were akin to a "pleasantry" that did not call for any response related to the investigation, much less an incriminating response. Indeed, a period of time passed between Officer Avilla's "small talk" and Kazanas's incriminating statement, and Kazanas's statement itself was not responsive to Officer Avilla's questions. Kazanas's trial testimony confirms that his statement was not made in response to a question posed by Officer Avilla. When defense counsel asked Kazanas why he made the statement, Kazanas responded that he "was under stress," and when asked what he was talking about, Kazanas replied, "Nothing. I was just speculating to the fact that they said that I was under arrest for an assault."[3]

_____

[3] Also, similar to Ikaika, the record reflects that Kazanas had prior encounters with law enforcement and the criminal justice system, having previously been arrested and convicted of other offenses.

Under the totality of the circumstances, we hold that Officer Avilla's questions did not constitute interrogation as we are unable to conclude that Officer Avilla "should have known that . . . her words or actions were reasonably likely to elicit an incriminating response" from Kazanas. See Ketchum, 97 Hawai'i at 119, 34 P.3d at 1018; Ikaika, 67 Haw. at 567, 698 P.2d at 284-85; see also, Mickey v. Ayers, 606 F.3d 1223, 1236 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."). Kazanas's statement was a "volunteered statement[]" that was "given freely and voluntarily without any compelling influences[.]" See Miranda, 384 U.S. at 478. As in Ikaika, we conclude that Kazanas's statement was an unsolicited, spontaneous statement that was not the product of interrogation. See Ikaika, 67 Haw. at 567-68, 698 P.2d at 284-85. Accordingly, the Circuit Court did not err in permitting the State to introduce Kazanas's statement at trial.

II.

Kazanas contends that the Circuit Court erred in permitting evidence of prior incidents involving Kazanas, pursuant to Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2013) and HRE Rule 403 (1993). We disagree.

A.

HRE Rule 404(b) provides, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

(Emphasis added.)

HRE Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Under HRE Rule 404(b), evidence of "other crimes, wrongs, or acts" is admissible when: (1) it is relevant to any fact of consequence other than the defendant's propensity to commit the crime charged; and (2) its probative value is not substantially outweighed by the danger of unfair prejudice. State v. Renon, 73 Haw. 23, 31-32, 828 P.2d 1266, 1270 (1992). A trial court's determination that evidence is relevant turns on the application of HRE Rule 401 (1993)[4] and is reviewed under the right/wrong standard. State v. Cordeiro, 99 Hawai'i 390, 404, 56 P.3d 692, 706 (2002). The trial court's decision in balancing probative value against unfair prejudice involves the application of HRE Rule 403 and is reviewed for abuse of discretion. Id. A trial court does not abuse its discretion unless it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (internal quotation marks and brackets omitted).

B.

In support of his mistaken-identity defense, Kazanas testified that due to the serious injuries he previously sustained in his nine-story fall, he was physically incapable of engaging in the conduct alleged by the CW, namely, jumping on the hood of the car and reaching into the car and punching the CW. In other words, Kazanas asserted that he could not have been the perpetrator because he was physically incapable of committing the act alleged by the CW. Kazanas's testimony placed his physical capabilities directly in issue and opened the door to the State's introduction of evidence of the prior incidents to show that after Kazanas's nine-story fall, he was physically capable of running, jumping, and punching others. See Green v. State, 831

---

[4] HRE Rule 401 defines "relevant evidence" as follows:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

S.W.2d 89, 94-95 (Tex. Ct. App. 1992) (stating that when the defendant opens the door, "the State is permitted to complete the picture by presenting evidence that would otherwise have been inadmissible"); Credille v. State, 925 S.W.2d 112, 116 (Tex. Ct. App. 1996) (applying Texas evidentiary rule, which "permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter 'opened up' by the adverse party"); State v. Malshuk, 857 A.2d 282, 286 (Vt. 2004) (stating that where defense counsel attempts to impeach a witness's credibility by painting an incomplete picture, "the State may complete the picture with 'appropriate detail'").

Kazanas's testimony made the extent of his physical capabilities after the nine-story fall highly relevant, and we cannot say that the Circuit Court abused its discretion in balancing the probative value of the evidence regarding the prior incidents against the risk of unfair prejudice, in allowing the State to introduce evidence of the prior incidents. Moreover, the Circuit Court gave limiting instructions to the jury before allowing the State to question Kazanas about the prior incidents and also during its charge to the jury. The limiting instructions advised the jury that it may only consider the evidence regarding the prior incidents "as bearing upon the credibility of [Kazanas] and whether [Kazanas] may or may not have certain physical capabilities." The limiting instructions further advised the jury that it may not consider the evidence as "establishing any violent or bad character of [Kazanas], or [as proving that] he acted in conformity therewith during the events underlying the alleged offenses in this case."

Juries are presumed to follow a trial court's instructions. See State v. Brooks, 123 Hawai'i 456, 471, 235 P.3d 1168, 1183 (App. 2010). The Circuit Court's limiting instruction served to mitigate any unfair prejudice resulting from the evidence of the prior incidents. See id. ("The

23

prejudicial effect of prior bad-act evidence can be reduced or eliminated by proper jury instructions."). We conclude that the Circuit Court did not err in permitting the State to introduce evidence of the prior incidents involving Kazanas that were relevant to his physical capabilities.

CONCLUSION

For the foregoing reasons, we affirm the Circuit Court's Judgment.

On the briefs:

Randall I. Shintani
for Defendant-Appellant

Donn Fudo
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*